**Robert ZIMMERMAN, Plaintiff,**

**v.**

**Katherine D. CROTHALL, Michael Gausling, Peter Molinaro, Robert Toni, Steve Bryant, Originate Adhezion A Fund, Inc., a Delaware corporation, Originate Adhezion Q Fund, Inc., a Delaware corporation, Originate Ventures, LLC, a Delaware limited liability company, Liberty Ventures II, L.P., a Delaware limited partnership, Liberty Advisors, Inc., a Delaware corporation, and Thomas R. Morse, Defendants,**

**and**

**Adhezion Biomedical LLC, a Delaware limited liability company, Nominal Defendant.**

**C.A. No. 6001–VCP.**

Court of Chancery of Delaware.

Submitted: Sept. 14, 2012.
Decided: Jan. 31, 2013.

Evan O. Williford, Esq., The Williford Firm LLC, Wilmington, Delaware; Attorneys for Plaintiff.

Richard A. Barkasy, Esq., Schnader Harrison Segal & Lewis LLP, Wilmington, Delaware; David Smith, Esq., Stephen A. Fogdall, Esq., Benjamin D. Wanger, Esq.,

Schnader Harrison Segal & Lewis LLP, Philadelphia, Pennsylvania; Attorneys for Defendants.

## OPINION

PARSONS, Vice Chancellor.

This case addresses the allegations of a minority unitholder in a privately held medical device company. The unitholder is the co-founder and former CEO of the company. He became a minority stakeholder after accepting investments in the company in exchange for units and after he sold some of his own units. The company is managed by a board of directors under its limited liability company operating agreement. The board of directors caused the company to enter into several financing transactions. The unitholder alleges that these transactions were in breach of the company's operating agreement and that, by undertaking the transactions, the directors also breached their fiduciary duties. He further alleges that certain unitholders breached fiduciary duties and that they and their affiliates aided and abetted the directors' breach of fiduciary duties.

A three-day trial was held on the unitholder's claims. After careful review of the evidence presented at trial and the parties' post-trial briefs and oral arguments, I conclude that the directors acted outside of their authority under the company's operating agreement, but that they did not breach the fiduciary duties they owed thereunder when they engaged in the financing transactions. Apart from entering a declaratory judgment that the directors exceeded their authority in engaging in the financing transactions, I deny the unitholder's requested relief, including his request that the defendants reimburse the company for its advancement of their attorneys' fees in this matter. I hold instead that the directors'

breach caused no damage and that all defendants were entitled to indemnification notwithstanding the directors' breach of the company's operating agreement.

## I. BACKGROUND

### A. The Parties

Plaintiff, Robert Zimmerman, is the co-founder, former CEO, and a former director of Adhezion Biomedical LLC ("Adhezion" or the "Company"). Zimmerman currently owns 86,900 Class A Common units and 40,000 Class B Common units in Adhezion.

Nominal Defendant, Adhezion, is a privately held Delaware limited liability company with its principal place of business in Wyomissing, Pennsylvania. Adhezion is a medical device company that develops and commercializes surgical, wound management, and infection-prevention technologies.

The defendants in this action include the five members of Adhezion's board of directors (the "Board") and entities that have invested in, or are affiliated with an entity that invested in, Adhezion (collectively, "Defendants").

Defendants Katherine D. Crothall, Michael J. Gausling, Peter Molinaro, Robert Toni, and Steven R. Bryant are Adhezion's Board members (the "Director Defendants"). Molinaro is Adhezion's CEO and the Board Chairman.

Defendant Liberty Advisors, Inc. invested in Adhezion through its subsidiary, Defendant Liberty Ventures II, L.P. (collectively, "Liberty"). Defendant Thomas R. Morse is the co-founder and principal of Liberty Advisors, Inc. Crothall serves as Liberty's Board designee.

Defendant Originate Ventures, LLC is a venture capital firm that has invested in Adhezion through Defendants Originate

Adhezion A Fund, Inc. and Originate Adhezion Q Fund, Inc. (collectively, "Originate"). Gausling is one of three managing partners of Originate Ventures, LLC and serves as Originate's Board designee.

## B. Facts

Adhezion makes three main products: SurgiSeal, DermaSeal, and FloraSeal. The product that is the focus of the events leading up to this litigation is SurgiSeal, a medical adhesive used to close both accident-caused wounds and surgical incisions. SurgiSeal received approval from the United States Food and Drug Administration ("FDA") in December 2008. SurgiSeal competes with a Johnson & Johnson ("J & J") product called Dermabond. Dermabond holds approximately 85% of the domestic market for high-strength medical adhesives.[1] Molinaro estimates that the global market for high-strength medical adhesives was $500 million in 2008 and over $600 million in 2010.[2] Adhezion's SurgiSeal shows promise as a competitor to Dermabond. It allegedly has performance advantages over Dermabond[3] and is cheaper to produce.[4] Dermabond, however, has advantages over SurgiSeal including its existing market share and the powerful backing of J & J.[5] In 2010, the Cleveland Clinic placed SurgiSeal on its "primary vendor list."[6] In obtaining that business, Adhezion demonstrated that the Cleveland Clinic could save $300,000 annually if it converted 100% of its topical skin adhesive business to Adhezion.[7] Due to stiff competition from J & J, however, the Clinic purchased only "4 or 5 percent of their annual purchase from [Adhezion] and they stayed with the J & J product."[8]

### 1. Originate invests; Operating Agreement amended

Although the Company faced strong competition, it showed promise. Molinaro joined Adhezion as a consultant in 2007.[9] Zimmerman and Molinaro attracted at least two potential investors between 2007 and 2008. In March 2008, Originate invested $3 million in Adhezion in return for 375,000 Series A Preferred units at $8.00 per unit.[10] This transaction valued Adhezion at $8 million.[11] In connection with this transaction, Adhezion adopted a new operating agreement (the "Amended Operating Agreement").[12] Under the Amended Op-

---

1. Trial Tr. ("Tr.") 14 (Zimmerman); Tr. 533 (Toni). Where the identity of the testifying witness is not clear from the text or a nearby citation, it is indicated parenthetically after the cited page of the transcript.

2. JX 200 (Molinaro) (stating that "[e]ither everyone is blowing smoke or the market is well over $600 MM today").

3. Tr. 19–31 (Zimmerman).

4. Tr. 284, 316–17 (Molinaro).

5. Tr. 317.

6. Tr. 283 (Molinaro).

7. *Id.*

8. Tr. 283–84 ("[I]mmediately after we had made their presentation and gave [the Cleveland Clinic] a price, we were told that J & J flew in there with [ ] their top brass and dropped their price and gave them discounts on additional products.").

9. Tr. 239 (Molinaro).

10. *Id.*

11. Tr. 243–44 (Molinaro); Tr. 432–33 (Gausling).

12. For the most part, the relevant provisions in the various versions of Adhezion's Operating Agreement are identical. In this Opinion, I refer or cite to the "Operating Agreement" in general unless a distinction is relevant. The Amended Operating Agreement appears in the record at JX 25; the Second Amended Operating Agreement appears at JX 38; and the Third Amended Operating Agreement appears at JX 226.

erating Agreement, the Company had five directors on its Board.[13] Its equity ownership was represented by Class A Common, Class B Common, and Series A Preferred units, the rights, preferences, and privileges of which were set forth in the Operating Agreement.

After the deal with Originate, Molinaro became Adhezion's CEO and a director. Also on the Board in March 2008 were Gausling, an initial Series A Preferred Director, and Zimmerman, the initial Common Director under the Amended Operating Agreement. In June 2008, and at Molinaro's suggestion, the Board elected Bryant to serve as Adhezion's Industry Director.[14] Bryant works at Angiotech, a customer of Adhezion. Bryant and Molinaro have worked together in various engagements since the 1980s.[15] They also have a personal friendship and have hunted together on several occasions and fished together once.[16]

### 2. Liberty invests; Second Amended Operating Agreement

In October 2008, while the Company was developing SurgiSeal and FloraSeal and attempting to secure FDA approvals, Moli-naro sought and obtained funding from several additional investors, including Liberty, Crothall, and non-parties William Graham and his wife (collectively, the "Liberty Investors").[17] These investors contributed $2 million in exchange for 281,-917 Series A Preferred units at approximately $7.05 per unit. This transaction effectively valued the Company at $10.5 million. As part of the transaction, the Amended Operating Agreement was amended again to create the Second Amended Operating Agreement. Among other things, the Second Amended Operating Agreement increased the number of directors on Adhezion's Board to six.[18] Crothall and Gausling became the Series A Directors while Molinaro and Zimmerman remained the CEO and Common Directors, respectively. Bryant continued to serve as one Industry Director. The second Industry Director position apparently was never filled. The Company obtained the consent of the Common unitholders for this transaction with the Liberty Investors, including for the execution of the Second Amended Operating Agreement.[19]

In January 2009, Zimmerman's employment with Adhezion was terminated and

---

13. Am. Operating Agreement § 6.2(a). The Company's directors included: a "CEO Director," who is the then-current CEO; two "Series A Preferred Directors," who are elected by a majority-in-interest of the Series A Preferred unitholders; a "Common Director," who is elected by a majority-in-interest of the Class A Common unitholders; and an "Industry Director" who is elected by a majority of the CEO Director, the Series A Preferred Directors, and the Common Director and who is neither a Member nor an Affiliate of any Member, as those terms are defined in the Operating Agreement

14. JX 28.

15. Tr. 296–97 (Molinaro).

16. Tr. 295–96.

17. Tr. 244–45.

18. Second Am. Operating Agreement § 6.2. The Second Amended Operating Agreement gave Liberty and Originate the right to designate a director and increased the number of Industry Directors to two. The CEO and Common directorships remained in place.

19. JX 35 (email from Molinaro to Zimmerman: "Looks like we now have to get Common B Shareholder consent (at least the majority) for the transaction to occur"); Tr. 655 (Miller) (stating that the consent of the Common unitholders was required because, in addition to issuing additional units, the Company made changes for which Section 15.11 required Common unitholder consent, such as changing the Board composition and the consent requirement threshold for the Preferred unitholders).

he was removed as the Common Director. In March 2009, the Class A Common unitholders elected Toni, former president and CEO of Closure Medical, to replace Zimmerman as the Board's Common Director.[20] In the 1980s, Toni had worked with Bryant and Molinaro for approximately four years at a company called Cilco.[21] Molinaro, Crothall, Gausling, Bryant, and Toni were the directors on the Board at all relevant times.

### 3. Adhezion's prospects in 2009

In January 2009, the Company began to have difficulty with its intellectual property ("IP") rights. MedLogic Global Limited ("MedLogic") notified Adhezion that MedLogic had concerns that the process Adhezion employed to sterilize SurgiSeal infringed MedLogic's '800 patent.[22] Also in early 2009, Adhezion began negotiations with 3M Company ("3M") regarding a proposed exclusive licensing and distribution agreement.[23] Adhezion initially hoped that 3M would pay a $3 million up-front licensing fee for both SurgiSeal and FloraSeal.[24] As negotiations progressed into the summer, however, 3M expressed several concerns, including that consumers perceived SurgiSeal to be not as strong as its competitor Dermabond,[25] that SurgiSeal was equivalent to Dermabond but not superior to it,[26] that SurgiSeal lacked clinical trials,[27] that SurgiSeal faced the threat of patent litigation,[28] and that SurgiSeal could not compete effectively with J & J on price.[29]

### 4. July 2009 Issuance

On April 30, 2009, Adhezion was running low on cash and the Board resolved to accept a "bridge loan" in an amount up to $750,000.[30] The bridge loan was implemented in two tranches and the Board signed written consents for both.[31] The first tranche was issued on July 17, 2009 when Originate, Liberty, Molinaro, Crothall, and Graham provided the Company with $525,000 in return for promissory notes convertible into Series A Preferred units at approximately $7.05 per unit, or into a new series of units issued in the future at a different price (the "July 2009

---

20. JX 55; JX 56. Zimmerman contends that the Common Directorship has been vacant since his removal and that Toni is the second Industry Director. There is some evidence to support Zimmerman's view. *See, e.g.*, JX 67; Tr. 97–99 (Zimmerman); Tr. 536–38 (Toni). I find the evidence that Toni was the Common Director slightly more persuasive, but ultimately have concluded that which directorship remained vacant is immaterial to my resolution of this case.

21. Tr. 288–89 (Molinaro) (recalling that he worked at Cilco between 1977 and 1986 and that Toni worked there from 1982 to 1986).

22. JX 48.

23. JX 66 (e-mail discussing "3M Term Sheet Counters for Consideration"); JX 67, April 30, 2009 Board of Directors' Meeting Minutes.

24. JX 110.

25. JX 72 (June 26, 2009 e-mail from John Prelaz to Molinaro and Manuel Rodriguez discussing 3M).

26. JX 109 (August 28, 2009 e-mail chain among Crothall, Molinaro, Gausling, Toni, and Bryant regarding "Important 3M Update").

27. JX 107 (August 21, 2009 e-mail chain between Toni and Molinaro discussing 3M).

28. Tr. 250–51 (Molinaro).

29. *Id.*

30. JX 67.

31. JX 100, July 17, 2009 Written Consent of Directors in Lieu of Meeting; JX 182, December 15, 2009 Written Consent of Directors in Lieu of Meeting.

Issuance").[32] In addition, warrant coverage of 100% was considered and rejected as "too rich and too discouraging to management." [33] Instead, the Company issued warrants for an extra 50% of the amount of the promissory notes for what Zimmerman contends was no additional consideration.[34]

Adhezion was still in negotiations with 3M when it received the first tranche of the bridge loan. The Company also was attempting to find additional sources of capital in the form of both prospective investors and possible strategic partners.[35] Between July 2009 and February 2010, Molinaro contacted over forty prospective investors and attended events sponsored by venture capital firms.[36] But all of these efforts were unsuccessful.[37]

### 5. 3M terminates discussions

On September 17, 2009, 3M terminated discussions with Adhezion.[38] Molinaro reported to the other Board members that he was "blind-sided" and "stunned" and that "the cash raising issue is even more critical" because the Company had "just 5 weeks of cash on hand." [39] At a September 29, 2009 Board meeting, Gausling and Morse stated that their respective firms (Originate and Liberty) would continue temporarily to satisfy Adhezion's operating cash requirements until the Company "saw where the Medline or Braun discussions finalized." [40] The Board then recommended that Molinaro cease capital-raising activities and instead focus his attention on finding a strategic distribution partner, such as Medline or Braun, to replace 3M.[41]

Zimmerman casts this Board recommendation as an attempt by Liberty and Originate to maintain control of the Company by preventing outside investment. To prove his point, Zimmerman relies on an e-mail regarding an upcoming investor presentation conference. In the e-mail, Molinaro identified the following issue to be addressed: "Explain how much money we are seeking ($2.5–5M?) This is a sensitive issue as Liberty & Originate both would like to see this a smaller number." [42] Around the same time, however, Originate's Gausling e-mailed Jim Datin, a principal at Safeguard Scientific, and asked if Datin would be "willing to have [his] team take a look at Adhezion?" [43] Gausling told Datin that the Company "would like to raise somewhere in the neighborhood of $5

---

32. JX 77, July 17, 2009 Adhezion Biomedical LLC Note and Warrant Purchase Agreement.

33. JX 70 at D026179.

34. JX 89, July 17, 2009 Adhezion Biomedical, LLC Warrant to Purchase Series A Series A Preferred Units for subscriber Molinaro.

35. Tr. 247–48, 254–55 (Molinaro).

36. JX 384, Molinaro's contact log; Tr. 247–48.

37. Tr. 248.

38. JX 113.

39. *Id.*

40. JX 117, September 29, 2009 Board Meeting Minutes; *see also* Tr. 373–74 (Bryant) (stating that the minutes reflect that Morse represented Crothall at the September 29, 2009 Board meeting); Tr. 421 (Morse) ("I was attending … for Liberty Ventures as a visitor to the board meeting. I have visitation rights, I think. I can go to board meetings if I want.").

41. JX 117; Tr. 254–55 (Molinaro).

42. JX 116. This September 25, 2009 e-mail also indicates that Molinaro had not completely ceased fundraising efforts after the September Board meeting.

43. JX 130, October 28, 2009 e-mail from Gausling to Datin. Gausling serves on the

mil[lion]" and that Originate "would participate in the round if that is needed, but would be equally content with new monies in alone." [44]

### 6. Kensey Nash makes an offer

In November 2009, Kensey Nash Corporation ("Kensey Nash") proposed to buy Adhezion for $10 million.[45] As proposed, the transaction included a $4 million cash payment and $6 million in milestone payments.[46] The Board considered this proposal to be "too low and too early." [47] On December 8, 2009, the Board made a counterproposal of $20 million in cash and an earn-out of up to $30 million.[48] Kensey Nash rejected this proposal as not "realistic." [49] After reviewing Adhezion's financial information over the next few months,[50] Kensey Nash ultimately decided not to raise its initial offer and terminated discussions.[51] As Molinaro reported to the Board, Kensey Nash "wanted to see some traction of sales to support a higher valuation." [52]

Also in November 2009, Medline demonstrated interest in partnering with Adhezion.[53] By December 2009, however, Medline had decided not to pursue a license and distribution agreement with Adhezion due in part to the risk of a patent infringement lawsuit with J & J.[54]

### 7. December 2009 Issuance

In December 2009, Adhezion implemented the second tranche of the bridge loan. Originate, Liberty, Molinaro, Crothall, and Graham provided the Company with a total of $315,000 in return for promissory notes subject to the same terms as the July 2009 Issuance (the "December 2009 Issuance" and together with the July 2009 Issuance, the "2009 Issuances").[55]

### 8. February 2010 Issuance; Third Amended Operating Agreement

By early 2010, the Company again needed money.[56] In January, Adhezion stopped producing SurgiSeal to work on a reformulation of the sterilization process that it hoped would allay any concerns of infringing MedLogic's and J & J's patents.[57] At a January 15, 2010 meeting, the Board determined that, subject to acceptable terms, it would secure an additional $1 million investment in Adhezion by the existing unitholders.[58] On January 22,

---

healthcare advisory board at Safeguard Scientific. Tr. 442 (Gausling).

**44.** *Id.*

**45.** JX 139.

**46.** *Id.*

**47.** Tr. 312 (Molinaro).

**48.** JX 154.

**49.** JX 197.

**50.** JX 156; JX 158; JX 200.

**51.** JX 212.

**52.** *Id.*

**53.** JX 138.

**54.** JX 157; JX 191; JX 194, January 15, 2010 Board of Directors' Meeting Minutes.

**55.** JX 182, December 15, 2009 Written Consent of Directors in Lieu of Meeting. The December 2009 Issuance brought the total amount of the bridge loans up to $840,000, $90,000 more than the $750,000 approved by the Board at the April 30, 2009 Board meeting. The full amount of the December 2009 Issuance, however, was approved by a unanimous written consent of the Board on December 15, 2009. *Id.*

**56.** Tr. 479–80 (Crothall).

**57.** Tr. 261–65, 275 (Molinaro). By early 2011, the reformulation was completed and Adhezion's new sterilization process was approved and validated. Tr. 356 (Molinaro).

**58.** JX 194.

Crothall circulated a term sheet to Gausling and Morse in which she proposed a $4 price per unit without including any financial analysis to support that price.[59] Rather, Crothall listed three risk factors to account for the "significantly lower price" of this January 2010 issuance in comparison to the 2009 Issuances: the lack of sales realized, the lack of a strategic deal, and a potentially difficult IP front.[60]

In early 2010, Crothall drafted an e-mail to Carl Kopfinger, a member of Liberty Ventures' investment committee. She stated, "I believe that this Company should be salable in 2–3 years for $50–$100 [million]."[61] She also mentioned that her valuation was "consistent with [the CEO and Originate's] thoughts as well."[62] While Crothall drafted this e-mail in response to an e-mail from Kopfinger, she only sent the draft to Morse. Furthermore, Crothall characterized the draft at trial as "very optimistic" and denied ever sending such an e-mail to Kopfinger."[63]

The Board, in a unanimous written consent, ultimately accepted Crothall's terms. It approved the issuance of (1) a new series of units—Series B Preferred—at a price of $4 per unit and (2) warrants for the purchase of Series B Preferred units with a $4 strike price.[64] This transaction valued the Company at $13 million.[65] Pursuant to a Third Amended Operating Agreement executed on February 17, 2010, the Company was authorized to issue 1,622,590 Series B Preferred units.[66] According to the February 2010 Purchase Agreement, executed on the same day, the Company issued 625,745 Series B Preferred units and an equal number of warrants (the "February 2010 Issuance").[67] The February 2010 Purchase Agreement allowed the existing Preferred unitholders to purchase 625,000, or approximately 77%, of the new units and an equal number of warrants. The remaining 186,295 authorized Preferred Series B units, or approximately 23%, and an equal number of warrants, were reserved for purchase by the Common A unitholders.[68] At this time, Common A unitholders owned 20.79% of Adhezion units.[69] Common unitholder Robert Greenstein participated in the offering in addition to Liberty, Origi-

59. JX 201 at D24534.

60. *Id.* at D24352.

61. JX 210, February 2, 2010 e-mail from Crothall to Morse; Tr. 486 (Crothall).

62. JX 210. Gausling testified that he "didn't say in two to three years, [Adhezion] would be sold for 50 to $100 million" but that "[u]nder certain qualifying events, there could be that possibility, if certain things happened but it's all subject to a whole bunch of qualifiers." Tr. 468.

63. Tr. 486.

64. JX 241, February 17, 2010 Written Consent of Directors in Lieu of Meeting, at D28416–25; JX 224, February 17, 2010 Series B Preferred Unit and Warrant Purchase Agreement ("February 2010 Purchase Agreement"), at D28136.

65. Tr. 273 (Molinaro).

66. Third Am. Operating Agreement § 3.1(b)(iv). The main differences between the Second Amended and Third Amended Operating Agreements are that the latter reflects the creation of the Series B Preferred units, sets forth the number of Series B Preferred units the Company is authorized to issue, and purports to increase the number of Common B and Series A Preferred units the Company was authorized to issue.

67. JX 224.

68. JX 224 §§ 1.1, 1.3.

69. JX 159, December 15, 2009 "Adhezion Membership Schedule," at D022244.

nate, Molinaro, Crothall, and Graham.[70]

On April 23, 2010, the Board considered and approved "revised Option Grants to Employees as a Result of the Series B Dilution."[71] These options had strike prices reflecting a 70% discount from the last preferred round, for a strike price of $1.20 per unit.[72] As part of this option grant, Molinaro received 120,000 "profit interests."[73]

On May 18, 2010, Zimmerman sold 64,992 of his Class A Common units to Graham at a negotiated price of $2 per unit.[74] This sale reduced Zimmerman's share of the Company's total equity to approximately 3.4%.[75] On December 3, 2010, Arteriocyte made an overture to acquire Adhezion or merge with the Company based on a valuation of $15 million.[76]

### 9. January 2011 Issuance

By the end of 2010, Adhezion again had little money.[77] In December 2010, the Board approved a resolution to accept a bridge note for $1 million in additional financing.[78] On January 10, 2011, Toni, Bryant, and Molinaro, acting for the Board, approved the issuance of promissory notes convertible into Series B Preferred units at a purchase price of $4 per unit, up to an aggregate amount of $2.5 million.[79] Preferred unitholders were permitted to purchase up to $1,285,000 of these notes and Common A unitholders were permitted to purchase the remaining $1,215,000.[80] That same day, Preferred unitholders Molinaro, Crothall, Originate, and Graham purchased promissory notes having an aggregate principal amount of

---

70. JX 224 at D028175. Greenstein purchased 745 units; the existing Preferred unitholders purchased 625,000 units. Pursuant to the terms of the 2009 Issuances, the holders of the promissory notes issued in those transactions could convert the notes into any units issued in a future financing at the cash purchase price per unit of such future financing. *See* JX 79 § 5(b); JX 170 § 5(b); JX 224 § 7.15. Accordingly, the Preferred members paid $875,000 of the $2.5 million aggregate purchase price of the February 2010 Issuance by converting the promissory notes they had received in the 2009 Issuances. Tr. 272 (Molinaro).

71. JX 259 (e-mail from Molinaro circulating the proposed revised option grants to the Board); JX 411 (stating, in a document titled "April 23, 2010 Telephonic Board Resolution of Options," that the Board approved the option grants following a telephonic meeting on April 23, 2010).

72. JX 411.

73. *Id.* Two employees, Molinaro and Ruiz, received "profit interests" and ten others received "options." *Id.* at D029937. The Operating Agreement provides that "the Class B Common Units are intended to constitute 'profits interests,' as such term is used by Rev. Proc. 93–27 and Rev. Proc. 2001–43." Oper-

ating Agreement § 3.3(b)(v). The parties presented no additional evidence explaining the structure of this option grant.

74. JX 265, Unit Purchase Agreement; JX 260 (e-mail chain from Zimmerman to Graham and then from Graham to Crothall and Molinaro).

75. JX 297 at D032627.

76. JX 298; Tr. 318 (Molinaro: "I received an oral expression of interest").

77. Tr. 284 (Molinaro: "We had a very little bit of money at the end of 2010, and I think we lost 1.7 million on the 2010 year on $425,000 in sales."). According to Molinaro, Adhezion had little chance of attracting short-term outside funding at this time. *Id.* Indeed, even Liberty, an existing investor, did not participate in the January 2011 Issuance. *Id.*

78. JX 296, December 3, 2010 Board of Directors' Meeting Minutes.

79. JX 326, January 10, 2011 Written Consent of Directors in Lieu of Meeting; JX 312, January 10, 2011 Note and Warrant Purchase Agreement.

80. JX 312 § 1.1.

$1,285,000 (the "January 2011 Issuance," and together with the July 2009, December 2009, and February 2010 Issuances, the "Challenged Transactions").[81]

## C. Procedural History

On November 18, 2010, Zimmerman filed his initial verified complaint. On February 28, 2011, he moved to amend his complaint primarily to add Originate Ventures and Morse as Defendants and to challenge the January 2011 Issuance. I granted that motion and Zimmerman filed an amended complaint on May 19, 2011 (the "Complaint"). Defendants later moved for summary judgment. In an Opinion dated March 5 and revised on March 27, 2012, I granted summary judgment in Defendants' favor on Plaintiff's duty of care claims and denied summary judgment on his claims for breach of the duty of loyalty, breach of contract, and aiding and abetting a breach of the duty of loyalty (the "Summary Judgment Opinion").[82] Trial on these surviving claims took place on April 23–25, 2012. I heard post-trial oral argument on September 14.

This Opinion constitutes my post-trial findings of fact and conclusions of law on these claims.

## D. Parties' Contentions

■ Zimmerman brings this action derivatively on behalf of Adhezion challenging actions undertaken through its Board.[83] Plaintiff first contends that the Director Defendants breached their duty of loyalty by engaging in unfair, self-dealing transactions. According to Zimmerman, the Director Defendants' approval of the Challenged Transactions should be analyzed under the entire fairness standard of review. He bases that argument on two different theories. First, he contends that, at the time of the transactions, Originate and Liberty exerted actual control over the Company and benefitted from the transactions. Alternatively, Zimmerman asserts that the entire fairness standard should apply because at least a majority of the Director Defendants were interested in the Challenged Transactions and received an exclusive benefit from them. In either case, Plaintiff argues that Defendants have

81. JX 312.

82. *Zimmerman v. Crothall*, 2012 WL 707238 (Del.Ch. Mar. 27, 2012).

83. In the Summary Judgment Opinion, I held that Plaintiff "properly has brought this fiduciary duty claim regarding the alleged overpayment by the Company on at least a derivative basis." *Id.* at *15. I left open the possibility that Zimmerman also had asserted a claim for direct relief pending development of the record at trial. *Id.* at *15 n. 83. The parties neither briefed nor argued this issue after trial. I therefore consider Zimmerman to be proceeding on a derivative basis only. This is an appropriate derivative action because Plaintiff seeks relief for injuries done to the LLC and because he pled demand excusal with particularity and sufficiently to "create a reasonable doubt that, as of the time the complaint [was] filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Ishimaru v. Fung*, 2005 WL 2899680, at *12 (Del.Ch. Oct. 26, 2005); *see also* 6 Del. C. § 18–1001 (providing LLC members and assignees the right "to bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor" when managers or members with authority to do so have refused, or an effort to cause them to do so "is not likely to succeed"); *id.* § 18–1003 ("In a derivative action, the complaint shall set forth with particularity the effort, if any, of the plaintiff to secure initiation of the action by a manager or member or the reasons for not making the effort."); *Eureka VIII LLC v. Niagara Falls Hldgs. LLC*, 899 A.2d 95, 96 (Del.Ch.2006) (recognizing the right of an LLC member or assignee to bring a derivative action on behalf of the LLC when another member breaches a contractual or fiduciary duty owed to the LLC).

failed to demonstrate that the Challenged Transactions were entirely fair. Additionally, Zimmerman claims that Originate, Liberty, and Morse aided and abetted the Director Defendants' breach of their fiduciary duty.

Zimmerman also claims that Defendants breached the Company's Operating Agreement when they engaged in four financing transactions without obtaining the consent of the Common members. Specifically, Zimmerman contends that the Agreement required the Board to obtain Common members' consent to authorize the additional units of Series A Preferred that the Company issued and to amend the Second Amended Operating Agreement to reflect the creation, authorization, and issuance of Series B Preferred units. To remedy these alleged wrongs, Plaintiff requests that the Court deem Defendants to have received nonconvertible promissory notes at 10% interest redeemable in five years. Lastly, Zimmerman requests that the Court order Defendants to reimburse Adhezion for the attorneys' fees and expenses that the Company paid on their behalf in connection with this action.

Defendants deny that any of them breached a duty of loyalty. They argue, first, that Adhezion's Operating Agreement establishes a contractual standard of review that modifies traditional fiduciary duties. Second, they argue that under any of the potentially applicable standards of review—the Operating Agreement, the business judgment rule, or entire fairness—Defendants did not breach their fiduciary duty of loyalty. In response to Zimmerman's duty of loyalty claim against Originate and Liberty, Defendants deny that these entities owed any duty to Adhezion or its unitholders. Defendants also challenge Plaintiff's aiding and abetting claim against these entities and Morse. In particular, they aver that because Zimmerman did not demonstrate that the Director Defendants breached their duty of loyalty to unitholders, there is no breach for Originate, Liberty, or Morse to have aided and abetted.

Defendants further dispute Zimmerman's claim that they breached the Operating Agreement. In that regard, they assert that the Board had authority to issue new units and create a new series of preferred units without the consent of the Common unitholders. Lastly, Defendants argue that they contractually were entitled to cause Adhezion to pay their attorneys' fees and, therefore, that they should not be required to reimburse the Company for those fees.

## II. ANALYSIS

### A. Breach of Contract Claim

I begin with Plaintiff's breach of contract claim which raises issues of contract construction. When interpreting a contract, the court's role is to effectuate the parties' intent based on the parties' words and the plain meaning of those words.[84] Of paramount importance is what a reasonable person in the position of the parties would have thought the language of the contract meant.[85] When construing an ambiguous contract, such as the one at issue here,[86] the court will consider

---

84. *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del.2006).

85. *Id.* (citing *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del.1992)).

86. In the Summary Judgment Opinion, I concluded that Sections 3.8, 6.13, and 15.11 of the Operating Agreement are ambiguous. *See Zimmerman v. Crothall*, 2012 WL 707238, at *19–21 (Del.Ch. Mar. 27, 2012). Because no evidence presented at trial has caused me to change that conclusion, I reaffirm it here.

all relevant objective evidence, including: overt statements and acts of the parties, the business context, prior dealings between the parties, and business customs and usage in the industry.[87] Courts use such evidence to construe the ambiguous contract language in a way that best carries out the reasonable expectations of the parties who contracted in those circumstances.[88] Courts also attempt to give meaning and effect to each word in a contract, assuming that the parties would not include superfluous verbiage in their agreement.[89] As the party seeking enforcement of his interpretation of the Adhezion Operating Agreement, Zimmerman bears the burden to prove his breach of contract claim by a preponderance of the evidence.[90]

The Operating Agreement at issue in this case is a contract governed by the Delaware Limited Liability Company Act (the "LLC Act").[91] The LLC Act provides contracting parties with flexibility to craft an agreement that is tailored to their needs.[92] Here, the drafters used this flexibility to include certain corporate law terms and concepts in their Operating Agreement. As one example, they issued ownership interests in units as opposed to admitting members.[93] They also used a number of well-understood terms relating to corporate stock including the three terms relevant here: create, authorize, and issue. Because each of these terms is used in the Adhezion Operating Agreement, I interpret the Agreement in a way that gives each term meaning and effect.[94] In doing so, I recognize that the parties, working under the LLC Act, could have assigned a meaning to these terms that differs from the term's ordinary corporate law meaning.

Zimmerman's breach of contract claim centers on whether the Operating Agreement requires approval of the Common unitholders (1) to increase the number of units the Company is authorized to issue and (2) to create additional classes or series of units. My analysis of his claims focuses on four sections of the Agreement. First, Section 3.1(b) sets forth the "number and Classes and Series of Units" the Company is "authorized to issue" as of the Agreement's Effective Date.[95] Second, Sec-

87. *Bell Atlantic Meridian Sys. v. Octel Commc'ns Corp.*, 1995 WL 707916, at *6 (Del. Ch. Nov. 28, 1995).

88. *Id.*

89. *NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del.Ch.2007).

90. *Lillis v. AT & T Corp.*, 2008 WL 2811153, at *4 (Del.Ch. July 21, 2008); *Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del.Ch. Aug. 20, 2009), *aff'd*, 991 A.2d 1153 (Del.2010).

91. *6 Del. C.* ch. 18.

92. *Elf Atochem North Am., Inc. v. Jaffari*, 727 A.2d 286, 290 (Del.1999) ("The [LLC Act] can be characterized as a 'flexible statute' because it generally permits members to engage in private ordering with substantial freedom of contract to govern their relationship, provid-

ed they do not contravene any mandatory provisions of the [LLC Act].").

93. *See 6 Del. C.* § 18–301 (discussing admission of members and providing that a person may be admitted as a member of an LLC without making a contribution to the LLC or acquiring an LLC interest in the company).

94. *See NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del.Ch. 2007).

95. Under Section 3.1(b) of the Amended Operating Agreement, the Company was authorized to issue 340,000 Class A Common units; 266,250 Class B Common units; and 393,750 Series A Preferred units. In the Second Amended Operating Agreement, the number of Class A Common units remained the same; the number of Class B Common units increased to 415,972; and the number of Series

tion 3.2 effectively gives the Series Preferred members veto power over certain actions. Specifically, and in relevant part, it restricts the Company's ability to "engage in or take any of the following actions without the affirmative vote or written consent of a Required Interest of the Series A Preferred Members: ... (v) create, authorize or reserve any Units or Derivative Rights; (vi) issue, sell or grant any Units or Derivative Rights...."[96] Third, the Agreement gives the Board the following authority in Section 3.8:

> Subject to the provisions of Section 3.2 hereof, the Board of Directors may, at any time and from time to time, issue additional Units (including, without limitation, Class B Common Units pursuant to Section 3.3(b) hereof) or create additional Classes or Series of Units having such relative rights, powers and duties as the Board of Directors may establish, including rights, powers and duties senior to existing classes of Units.

Lastly, Section 15.11 governs amendments to the Operating Agreement and provides in pertinent part:

> *Except as otherwise provided in Section 3.8 hereof with respect to the issuance of additional Units,* this Agreement and

any term hereof may be amended and the observance of any term hereof may be waived (either prospectively or retroactively and either generally or in a particular instance) with the written consent or vote of (a) a Required Interest of the Preferred Members, voting together as a single, separate class, and (b) a Majority–in–Interest of the Common Members, voting together as a single, separate class; provided that all non-consenting Members are treated in the same manner as the consenting Members by such amendment or waiver.[97]

### 1. Authorizing units

With these contractual provisions in mind, I consider Zimmerman's claims. His first contention is that an Operating Agreement amendment was required to increase the number of authorized units set forth in Section 3.1(b). He further contends that Section 15.11 required the consent of the Common unitholders for such an amendment. Defendants counter that, unlike the Delaware General Corporation Law ("DGCL"),[98] the LLC Act does not require the authorization of equity in-

---

A Preferred units increased to 741,248. In the Third Amended Operating Agreement, the number of Class A Common units remained the same, the number of Class B Common units increased to 655,972; the number of Series A Preferred units increased to 1,040,-464; and the Series B Preferred was added and 1,622,590 units were authorized to be issued. *See* JX 25; JX 38; JX 226. The Board increased the number of Series A Preferred units that the Company purportedly was authorized to issue twice by written consents between the Second and Third Amended Operating Agreements: to 815,623 in connection with the July 2009 Issuance; and then to 858,123 in the December 2009 Issuance. *See* JX 100; JX 182.

**96.** The "Required Interest" is defined to mean "Members holding greater than two-

thirds (2/3) of either all the issued and outstanding Units or all the issued and outstanding Units of a particular Class or Classes or Series, as the context requires." Operating Agreement § 2.1.

**97.** *Id.* § 15.11 (emphasis added). The Common unitholders "have the right to vote or consent as a single class with the Members holding Preferred Units on all matters on which Members may vote and on all matters for which the consent of Members may be obtained." *Id.* § 3.3(a). The principal matter on which Common members can vote is an amendment to the Operating Agreement under Section 15.11.

**98.** 8 *Del. C.* §§ 101–619.

terests before those interests may be issued. Defendants concede that the Agreement contemplates the authorization of units. They contend, however, that this step is merely incidental to the Board's authority to create and issue units under Section 3.8 and its authority unilaterally to amend the Agreement under Section 15.11 with regard to its authority under Section 3.8.[99] Defendants further argue that such a structure is consistent with the absence of formal requirements in the LLC Act regarding the creation and issuance of LLC interests.[100] Zimmerman disputes this interpretation. He asserts that the plain language of the Agreement contemplates three distinct steps (create, authorize, and issue) and that Section 3.8 of the Agreement only empowers the Board unilaterally to undertake, at most, two of those steps.

 I agree with Zimmerman that the plain language of the Agreement indicates that the parties intended that units be authorized. Defendants' witness and the drafter of the first Amended Agreement, attorney Christopher Miller, confirmed that the use of the term authorize was deliberate.[101] He testified that, "under [the] Delaware statute as well as under this operating agreement, units [ ] are not required to be authorized prior to issuance. That said, we went through a process to authorize those units." [102]

The Operating Agreement, however, does not expressly address the process for authorizing units. Under the DGCL, the amount of authorized capital stock acts as a ceiling on the amount of stock a corporation may issue without seeking a charter amendment to increase that amount.[103] Here, Defendants contend that the statement in Section 3.1(b) of the number and classes and series of units that Adhezion is authorized to issue was not intended to limit the number of units the Board could issue unilaterally under Section 3.8. Miller provided the following explanation:

[T]he other thing that needs to be understood here with respect to authoriza-

---

99. The Board's authority to act under Section 3.8 actually is subject to Section 3.2 which requires the approval of more than two-thirds of the Series Preferred members. In the circumstances of this case, however, the interests of the Series Preferred members were aligned with at least those of Defendants Originate, Liberty, and Molinaro, who accounted for at least two-thirds of the Series Preferred members. At all relevant times, each of those parties or their designees served on the Board. Section 3.2, therefore, did not practically restrict the Board's authority to engage in any of the Challenged Transactions. Thus, I refer to the Board's authority to act under Section 3.8 as though it were authorized to act unilaterally.

100. *See* Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 5.15, at 5–89 (2010 Supplement) (emphasis added) ("The [LLC Act] establishes no formalities that must be observed for the creation and issuance of limited liability company interests.").

101. Although Miller's testimony is relevant and useful, its significance is limited. Extrinsic evidence may be used to interpret an ambiguous contract with the goal of effectuating the parties' intent. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del.2006). In this regard, Miller's intent as the drafter of the Operating Agreement is at least one step removed from the intent of his client and those who actually negotiated the Agreement. There is no evidence, for example, that the parties negotiated about the meaning of "authorize" in the context of the Challenged Transactions. Because Miller evidently had some involvement in the negotiations, however, I infer that he knew about his own client's intentions.

102. Tr. 646.

103. *See* 8 *Del. C.* § 242 (requiring an amendment to a corporation's certificate of incorporation to increase or decrease its authorized capital stock).

tion, and this applies particularly in the corporate setting, and since we've adopted somewhat of a corporate structure here, it applies here as well, the idea of authorizing units is not a power vested in a particular body. Different than the act of issuing units, which both corporate statutes and this operating agreement give to the board, and the power to create units, those are powers given to the board subject to the consent of the preferred. Authorization of units is subsumed within the act of amending the agreement. Same in the corporate statutes. If you look at corporate statutes, you won't anywhere see either the board or the stockholders given the power to authorize shares. Corporate statutes say how do you amend your certificate of incorporation? What are the steps you need to follow? And in an amendment to the certificate of incorporation, that is where shares are authorized. *That was the same intent here, was that units would be authorized through an amendment to the agreement.* So the question was, what does it take to amend the agreement? [104]

As Miller stated, there is no statutory requirement that there be an amendment to the Operating Agreement to increase the number of authorized LLC interests. Accordingly, I look to the terms of the Operating Agreement to determine the parties' intent in this regard. Because the Operating Agreement does not set forth a process for authorizing units, I conclude that the most reasonable interpretation of the Agreement is that the parties intended the authorization of units to be accomplished by an amendment to the Operating Agreement. Such a reading is also consistent with Miller's testimony in that regard.

■ I reach this conclusion notwithstanding that, in each of the first two Challenged Transactions, Defendants purported to increase the number of units the Company was authorized to issue using written consents of the Board, rather than an amendment to the Operating Agreement. Generally, the parties' actions under an agreement provide strong evidence of the contract's meaning.[105] In this case, however, the Director Defendants apparently acted without Zimmerman's knowledge and, promptly after learning of the relevant facts, he disputed Defendants' position that the Operating Agreement gave them the authority to authorize additional units without an amendment.[106]

## 2. Amending the Operating Agreement

Having concluded that Adhezion's units must be authorized and that an Operating Agreement amendment is the proper way to increase the number of units the Company is authorized to issue, I consider next what was required to amend the Agreement. Section 15.11 governs amendments. This Section requires the written consent or vote of both more than two-thirds of the Preferred members (the "Required Interest") and a majority-in-interest of the Common members to amend the Agreement. The sole exception to this voting requirement states: "Except as otherwise provided in Section 3.8 hereof with respect to the *issuance* of additional Units." [107] As

---

104. Tr. 646 (emphasis added); *see also* 8 *Del. C.* § 151.

105. *See Personnel Decisions, Inc. v. Bus. Planning Sys., Inc.,* 2008 WL 1932404, at *6 n. 29 (Del.Ch. May 5, 2008).

106. Zimmerman's employment was terminated at the end of 2008. Tr. 474–75 (Gausling). He contends that he learned of the 2009 Issuances in 2010 after filing the initial complaint in this case. Compl. ¶ 5.

107. Operating Agreement § 15.11 (emphasis added).

set forth above, Section 3.8 provides the Board the authority unilaterally to issue and to create additional units.

The parties dispute two issues related to the Board's authority unilaterally to amend the Agreement under Section 15.11. First, they dispute whether the exception relates to the entirety of Section 3.8 (create and issue) or whether it is limited to the Board's authority to issue units. Second, they disagree on whether the exception to Section 15.11 allows the Board to increase the number of units the Company is authorized to issue as part of the Board's authority under Section 3.8. There is no dispute that the consent of the Common unitholders is required for Operating Agreement amendments that do not fall within the exception to Section 15.11.

### a. To authorize units

■ I address first whether Common unitholder approval was required to increase the number of units the Company is authorized to issue. I conclude that it was. Defendants' argument that the act of authorizing units is subsumed within the Board's authority under Sections 3.8 and 15.11 is unpersuasive. The plain language of Sections 3.2, 3.8, and 15.11 indicates that the Agreement does not provide the Board unilateral authority to amend the Agreement to increase the number of units the Company is authorized to issue. Section 3.2 of the Operating Agreement expressly requires the consent of the Series Preferred members to create, authorize, and issue units, among other things. The parties similarly could have expressly provided the Board with authority to authorize units. They did not do so. Instead, Section 3.8 gives the Board authority only to issue and to create additional units. The

exception to the voting requirements for an amendment to the Operating Agreement in Section 15.11 relates only to the Board's authority in Section 3.8. To increase the number of authorized units, therefore, the Board would need to amend the Operating Agreement under Section 15.11, and that would require the specified consents or votes. Those consents include "a Majority–in–Interest of the Common Members voting together as a single, separate class." [108]

### b. To create units

■ In addition, Zimmerman contends that Section 15.11 further limits the Board's authority because the exception is only "with respect to the *issuance* of additional Units." [109] Zimmerman argues that the parties easily could have omitted this limiting language if they had intended the entirety of Section 3.8 to be carved out of Section 15.11. Zimmerman's reading is reasonable, but it is not the only reasonable interpretation of Section 15.11. For example, Defendants reasonably assert that the exception to Section 15.11 to exclude Section 3.8 "with respect to the issuance of additional Units" should be read to apply also to the creation of new classes or series of units as provided for in Section 3.8.

Having concluded that the Agreement is ambiguous on this point, I consider the extrinsic evidence presented at trial. The most compelling evidence appears in the progression of the pertinent sections of the Agreement during the relevant period. In 2008, before Originate's investment, the Amended Operating Agreement expressly gave the Board the authority only to create, not to issue, additional classes or series of units.[110] The pertinent provision

---

108. *Id.* § 15.11.

109. *Id.* (emphasis added).

110. Am. Operating Agreement § 3.9. The Amended Operating Agreement references Section 3.9 which is the equivalent of Section

provided in relevant part: "[T]he Board of Directors may, at any time and from time to time, create additional Classes or Series of Units...."[111] During the negotiations of the Second Amended Operating Agreement, the drafters renumbered this provision Section 3.8 and changed its language to read: "[T]he Board of Directors may, at any time and from time to time, issue additional Units (including, without limitation, Class B Common Units pursuant to Section 3.3(b) hereof) or create additional Classes or Series of Units...."[112] Miller explained that he believed the corresponding provision in the first Amended Operating Agreement contained a "loophole" because the section only expressly gave the Board authority to create additional units.[113] According to Miller, the Second Amended Operating Agreement was changed to close that loophole. Because the Common members approved that amendment, it would appear that Zimmerman agreed with this clarification.

The operative language of Section 15.11, however, remained unchanged between the Amended and Second Amended Operating Agreements. This Section at all times began: "Except as otherwise provided in Section 3.8 [or 3.9] hereof with respect to the issuance of additional Units." That is, even before Section 3.8 or its precursor included the word "issue," and when it only referred to the action of creating new classes or series, Section 15.11 identified Section 3.8 as relating to "the issuance of additional units." This drafting history strongly implies that the language "with respect to the issuance of additional Units" is not meant as limiting language. Rather, it broadly refers to the subject matter of the provision (Section 3.8) that it references. This reading also comports with Miller's explanation that "the purpose of amending Section 3.8 in October of 2008 was to clarify that the board had the authority to issue additional units and to create additional classes, not just create additional classes."[114]

Zimmerman failed to adduce any convincing evidence to support his contrary interpretation of the Second Amended Operating Agreement. He argues that addition of the word "issue" in Section 3.8, when that word was already in use in Section 15.11, strengthens his interpretation that the parties intended Section 15.11's exception to relate only to the portion of Section 3.8 addressing "issuance" of units. This is especially true, according to Zimmerman, because the parties "specifically negotiated" this change to Section 3.8.[115] Zimmerman admitted that he was not negotiating from a position of strength when he negotiated the Amended Operating Agreement with Originate.[116] Moreover, when Miller negotiated the clarification in Section 3.8 in the Second Amended Operating Agreement, he was representing Adhezion and possibly Originate. Nothing in the record suggests that Miller was aligned with Zimmerman or the Com-

3.8 in the Second Amended Operating Agreement.

111. *Id.*

112. Second Am. Operating Agreement § 3.8

113. Tr. 651–52 (Miller) ("It was clearly the intent under Section 15.11 that the board have the authority to issue additional units. The language says so itself.").

114. Tr. 654.

115. Tr. 649 (Miller) (testifying that the provisions related to additional units were "specifically negotiated" so that the Company could issue additional units without having to get the consent of the Common unitholders).

116. Tr. 103 (Zimmerman) (claiming that he "agreed to take that $3 million because they forced me and put me over a barrel").

mon unitholders at that time. In that context, I do not find credible Plaintiff's argument that he negotiated more rights for the Common unitholders in the Second Amended Operating Agreement than they previously had. To accept Zimmerman's position, I would have to accept that in the Second Amended Operating Agreement he or his representative carved back the Board's authority by leaving unchanged Section 15.11's reference to Section 3.8 "with respect to the issuance of additional Units" and adding "issue" to Section 3.8, so that it explicitly referred to both "issue" and "create." I consider that proposition too farfetched to be credible. Thus, because Zimmerman was unable to produce any more probative evidence to support his position, and based on the negotiating history of the Agreement, I conclude that Defendants' interpretation is correct on this point.

### 3. Did the Director Defendants breach the Operating Agreement?

Based on these findings, I conclude that the Board breached the Operating Agreement in undertaking each of the Challenged Transactions. In the 2009 Issuances, the Board purported to increase the number of Series A Preferred units the Company was authorized to issue by written consents. The Agreement, however, required an amendment approved by the Common unitholders for such an increase. The February 2010 and January 2011 Is-

suances were in breach of the Agreement because the Board issued unauthorized Series B Preferred units. Even though I conclude that the Board acted within its authority in amending the Agreement to reflect the creation of the Series B Preferred units, no Series B Preferred units properly had been authorized for issuance. Additionally, the purported increase in the number of Series A Preferred units that the Company was authorized to issue in the Third Amended Operating Agreement, and actually issued of those units in the February 2010 and January 2011 Issuances, were in breach of the Agreement for the same reason. That is, the Common unitholders never approved the amendment to the Agreement to increase the number of authorized units.

This outcome could have been avoided. The interpretation that Defendants advance is a plausible one that is consistent with the flexibility afforded by the LLC Act. If parties to an LLC operating agreement intend to deviate from the meaning that a reasonable investor would attribute to use of a term, however, it is incumbent upon them to manifest that intent.[117] In this case, I reject the strained meaning that Defendants place on the familiar corporate law term "authorize" when that term was incorporated imprecisely in Adhezion's Operating Agreement.[118] I have considered the extrinsic evidence Defendants presented through Miller's testimony.[119] This evidence, however, general-

---

**117.** *See Lorillard Tobacco Co. v. Am. Legacy Found.,* 903 A.2d 728, 739 (Del.2006) ("The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." (quoting *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195–96 (Del. 1992))).

**118.** *Id.* ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty.").

**119.** *See Harrah's Enter., Inc. v. JCC Hldg. Co.,* 802 A.2d 294, 313 (Del.Ch.2002) (concluding, in a case where the plaintiff stockholder took part in negotiating the corporate charter and bylaws, that *contra proferentum* against the corporation should be resorted to only after consideration of extrinsic evidence in part because "human imperfection ... creates an

ly supports the result I reach. Miller testified that the parties intended units to be authorized and intended that such authorization would take place through an Operating Agreement amendment. Defendants ask too much, however, when they urge this Court to conclude that the power to "authorize" units is incidental to and implicitly subsumed within other authority, viz., "to issue additional Units," expressly provided to the Board in the parties' Agreement. Although this Court generally will accept an interpretation of an LLC agreement where the agreement is not inconsistent with the provisions of the LLC Act, that tendency does not warrant accepting Defendants' interpretation in this case because that would contravene the plain meaning of the words the parties used.[120]

▆▆▆▆ Additionally, I find that this is a case where construing the ambiguous contract terms against the drafter is appropriate. The rule of *contra proferentum* is one of last resort that will not apply if a document can be interpreted by applying more favored rules of construction.[121]

Nevertheless, resort to the rule is appropriate "in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position, but it is not limited to such cases."[122] It is less likely to be appropriate where knowledgeable and experienced parties to a contract engaged in a series of negotiations.[123] Here, the Operating Agreement was negotiated by the parties.[124] Miller, however, admittedly was involved in the drafting of the Amended and Second Amended Operating Agreements. When Miller participated in the drafting of the Amended Operating Agreement, he was representing Originate in its negotiations with Adhezion regarding its initial investment. At that time, Miller's client Originate was in a stronger bargaining position. After Originate invested in Adhezion, Miller became Adhezion's attorney. Thereafter, Miller controlled the Agreement on behalf of Adhezion, but his firm also evidently retained its affiliation with investor Originate.[125] When Miller negotiated the Second Amended Operating Agreement with the Liberty Investors, the interests of Originate, Miller's original client, generally

---

ever-present risk that even talented negotiators may fail to spell out their intentions unambiguously").

**120.** See *Elf Atochem North Am., Inc. v. Jaffari*, 727 A.2d 286, 292 (Del.1999) (noting that "the commentators observe that only where the agreement is inconsistent with mandatory statutory provisions will the members' agreement be invalidated"); *see also Lorillard Tobacco Co.*, 903 A.2d at 739 ("[The Court] is constrained by a combination of the parties' words and the plain meaning of those words").

**121.** See *E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1114 (Del.1985).

**122.** *Restatement (Second) of Contracts* § 206 (1981).

**123.** *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1114.

**124.** Tr. 102–03 (Zimmerman) (stating that Adhezion's counsel negotiated with Originate's attorneys, Pepper Hamilton, but asserting that "it wasn't like there was even any real negotiation. They said, 'Take it or leave it' "); Tr. 639–40 (Miller) (stating that there were negotiations, changes were made to the original draft, and that it was not a "take-it-or-leave-it" situation). I find that there were negotiations as to the Second Amended Operating Agreement, but that the Company and the Preferred unitholders had the upper hand in those negotiations vis-à-vis the Common unitholders.

**125.** Miller is an attorney at Pepper Hamilton. Pepper Hamilton represented Defendants, including Originate, at the outset of this litigation.

were aligned with the new private equity investors. During these negotiations, the parties clarified the Board's authority to issue and create additional units, as discussed *supra*. They failed, however, clearly to explain their intent with regard to authorizing additional units. This concept of authorization typically would be important to the Common member because it relates to the level of dilution to which they may be subjected. Zimmerman, whose consent was obtained for the Amended and Second Amended Operating Agreements,[126] reasonably would have understood the use of the term "authorize" to place a limit on the level of dilution he would face before the Board was required to obtain his consent to increase that level. Defendants' extrinsic evidence does not clearly support a conclusion that the parties mutually agreed to modify the usual meaning of the term "authorize" in this Operating Agreement and to empower the Board implicitly to authorize additional units.[127] In the circumstances of this case, therefore, I conclude that it is appropriate to interpret the Operating Agreement against Defendants as its drafters and in favor of the meaning a reasonable investor would attribute to the Agreement.

Having concluded that the Director Defendants breached the Operating Agreement by entering into the Challenged Transactions, I also must address what would be an appropriate remedy. That analysis, however, involves equitable considerations that overlap with the issues presented by Zimmerman's breach of fiduciary duty claim. Accordingly, I defer my discussion of a remedy until Part II.D, *infra*.

### B. Breach of Duty of Loyalty Claim

Zimmerman asserts breach of fiduciary duty claims against the Director Defendants and against Defendants Liberty and Originate. His claim against the Director Defendants is based on those Defendants' status as members of Adhezion's Board. As directors, those Defendants are subject to fiduciary duties specified in Adhezion's Operating Agreement. Zimmerman's second claim is that Liberty and Originate owe fiduciary duties to Adhezion and its minority unitholders by virtue of being part of a group that controls Adhezion. This claim arises from the common law duty that would attach to a shareholder "exercis[ing] control over the business affairs of the corporation."[128] I consider this claim first.

#### 1. Liberty and Originate are not controlling shareholders

A shareholder will be considered "controlling" if it either owns more than 50% of the voting power of the company, or exercises "actual control" over the board of directors during the course of a

---

**126.** Miller testified that Common unitholders' consent was obtained for the Second Amended Operating Agreement because, in addition to reflecting an increase in the number of Series A Preferred units that were authorized, the amendment changed the board composition and the consent requirement threshold for the Preferred unitholders. Tr. 655.

**127.** *Cf. Harrah's Enter., Inc.*, 802 A.2d at 313 (holding, in the context of disenfranchisement of a stockholder, that if the Court concludes that a negotiated charter and bylaws are am-

biguous, it should evaluate the extrinsic evidence, but that it must rule against the drafting corporation "unless the evidence clearly and convincingly supports the conclusion that the usual right [the plaintiff] would have to nominate more than one candidate was limited by the charter and bylaws").

**128.** *See Kahn v. Lynch Comm'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del.1994) (citing *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del.1987)).

particular transaction.[129] Here, neither Liberty nor Originate owns a majority of the voting power. For Zimmerman to prove that Liberty and Originate are controlling shareholders, therefore, he must prove that they exercised "actual control" over the Board. To make such a showing, Plaintiff must demonstrate that "although lacking a clear majority, [the shareholders] have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control." [130] There is no contention in this case that either Liberty or Originate on its own exercised actual control over Adhezion's Board. Nevertheless, such power would exist where "various director-stockholders ... were involved in a blood pact to act together," [131] or where they were "bound together by voting agreements or other material, economic bonds to justify treating them as a unified group." [132] In the Summary Judgment Opinion, being constrained to take the evidence in the light most favorable to Zimmerman, I concluded that he possibly could make such a showing.[133]

The evidence at trial, however, does not support Plaintiff's allegation that Liberty and Originate acted together and thus should be viewed as a controlling shareholder group standing on both sides of the Challenged Transactions. Collectively, Liberty and Originate own 66% of Adhezion's voting shares and control at least two of the five directors on the Board.[134] Based on the preponderance of the evidence, however, I am convinced that they neither acted together nor were "connected in some legally significant way." [135] Liberty and Originate are two separate entities with no common ownership or management. Each entity designated one of its affiliates as its Board designee. The evidence also shows that the directors designated by Liberty and Originate, Crothall and Gausling, are sophisticated and competent businesspeople. There has been no showing that they acted as one unit or that one exerted control over the other. Indeed, Liberty did not participate in one of the Challenged Transactions while Originate participated in all four transactions.

Zimmerman relies heavily on a communication from the Board to Molinaro, me-

---

**129.** *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del.Ch. Aug. 18, 2006); *Zimmerman v. Crothall*, 2012 WL 707238, at *11 (Del.Ch. Mar. 27, 2012).

**130.** *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9.

**131.** *Id.* at *10.

**132.** *Id.* at *1.

**133.** *Zimmerman*, 2012 WL 707238, at *12.

**134.** Second Am. Operating Agreement § 3.12(b). Zimmerman asserts that Liberty and Originate actually have even more control over the Board. Specifically, he notes that the Operating Agreement allows the Series A Directors to fire Molinaro and then appoint a new CEO, who would serve as the CEO director. Pl.'s OB 7 (citing Sections 6.5 and 7.1 of the Operating Agreement). Neither of the provisions Zimmerman cites, however, expressly provides the Series A Directors with this authority and it is not clear that, together, they operate as Plaintiff suggests.

**135.** *See Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *3 (Del.Ch. May 22, 2009) ("Although a controlling shareholder is often a single entity or actor, Delaware case law has recognized that a number of shareholders, each of whom individually cannot exert control over the corporation (either through majority ownership or significant voting power coupled with formidable managerial power), can collectively form a control group where those shareholders are connected in some legally significant way—*e.g.*, by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal.").

morialized in the September 29, 2009 Board meeting minutes, to "cease all capital raising activities."[136] Plaintiff characterizes this as an instruction from Liberty and Originate intended to ensure that, together, those entities would be the only funding source available to Adhezion. The evidence as a whole, however, does not support that position. The minutes from the September 29, 2009 Board meeting, which took place approximately ten days after 3M terminated discussions with Adhezion, state:

> The board recommended that Molinaro cease all capital raising activities at this time, including discussions with other VC firms and attendance at investment conferences. Mike Gausling and Tom Morse advised Moloinaro [sic] that their respective firms would continue to temporarily satisfy Adhezion's operating cash requirements until we saw where the Medline or Braun discussions finalized[,] at which time we would make a decision about next capital raising steps.[137]

The Director Defendants questioned about this statement remembered it not as an instruction but as a "communication."[138] Molinaro was "told to focus on the business, not focus efforts on fundraising,"[139] and that Liberty and Originate were "giving the company runway enough in cash in order to try and do that."[140] Gausling explained that a question about the validity of the Adhezion patent was one issue that led to this discussion:

> All of that was at a point in time when 3M was gone and Medline was challenging the ... validity of the patent. And so without a strong supporting independent analysis of the patent situation, bringing other investors in didn't make any sense. And we needed to fund the company, A, because the company needed money immediately and it was a surprise because we thought 3M was going to come in and we needed to get a solid answer on that patent situation; and ultimately then we found we had to reformulate as well.[141]

Additionally, about a month after this meeting, Gausling himself attempted to secure outside funding of $5 million.[142]

Although Zimmerman relies on several other documents to support his argument, none of them supports the conclusion that Plaintiff would have this Court reach. The evidence, taken together, does not support Plaintiff's contention that Liberty and Originate were acting in concert, through a blood pact or voting agreement, and exerting "actual control" over the Board. I conclude, therefore, that there is no controlling shareholder, or group of shareholders, in this case. Thus, there is no basis for Plaintiff's breach of fiduciary duty claim against Liberty and Originate.

### 2. Fiduciary duties under the Company's Operating Agreement

I turn next to Zimmerman's breach of fiduciary duty claim against the Director Defendants. The starting point for analyzing this claim for breach of the fiduciary duty of loyalty is to determine what fidu-

---

136. JX 117 at D030039.

137. *Id.*

138. Bryant Dep. 56. The parties placed substantially all of Bryant's deposition testimony into evidence, including all portions relied upon in this Opinion.

139. Tr. 374 (Bryant).

140. Tr. 423 (Morse).

141. Tr. 441 (Gausling).

142. JX 130.

ciary duties the Board owes to the LLC and its members.[143] The LLC Act provides that the fiduciary duties of a member, manager, or other person that is a party to or bound by a limited liability company agreement "may be expanded or restricted or eliminated by provisions in the limited liability company agreement." [144] Accordingly, to decide fiduciary duty claims in the LLC context, the Court must closely examine and interpret the LLC's governing instrument to determine the parameters of the fiduciary relationship.[145]

Consistent with this framework, Adhezion's Operating Agreement specifically addresses both director fiduciary duties and the applicable standard of conduct for self-dealing transactions. As to the former, the Agreement sets forth the "Standard of Care of Directors" in Section 6.15. This provision provides in relevant part:

> The Directors shall stand in a fiduciary relation to the Company and shall carry out their duties and exercise their powers hereunder in good faith and in a manner reasonably believed by the Directors to be in the best interests of the Company and its Members and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances.[146]

This Section provides that directors are fiduciaries of the Company. They must act with subjective good faith ("in a manner *reasonably believed by the Directors* to be in the best interests of the Company and its Members") and must comply with an objective standard of reasonableness ("*and* with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances").

The Adhezion Operating Agreement does not specifically address a duty of loyalty in those terms. Instead it expressly addresses members, directors, and officers transacting business with the Company in Section 6.13 entitled, "Dealing with the Company." That Section provides:

> The Members, Directors, and officers and any of their respective Affiliates shall have the right to contract or otherwise deal with the Company or its Subsidiaries in connection therewith as the Board of Directors shall determine, provided that such payments or fees are comparable to the payments or fees that would be paid to unrelated third parties providing the same property, goods, or services to the Company or its Subsidiaries. No transaction between the Company or its Subsidiaries and one or more of its Members, Directors or officers . . . shall be void or voidable solely

143. See *Auriga Capital Corp. v. Gatz Props., LLC [Auriga I]*, 40 A.3d 839, 849 (Del.Ch. 2012) (citing *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149–50 (Del.Ch. 2006)), *aff'd*, 59 A.3d 1206 (Del.2012).

144. 6 *Del. C.* § 18–1101(c). The LLC Act does not allow for the elimination of the implied contractual covenant of good faith and fair dealing. Zimmerman has not claimed that Defendants breached this covenant.

145. See *Douzinas*, 888 A.2d at 1149–50. The Delaware Supreme Court has not yet definitively determined whether the LLC statute imposes default fiduciary duties. *See Gatz*

*Props., LLC v. Auriga Capital Corp. [Auriga II]*, 59 A.3d 1206, 1218–20 (Del.2012). This Court recently considered the issue of default fiduciary duties and held that, subject to clarification from the Supreme Court, managers and managing members of an LLC do owe fiduciary duties as a default matter. *See Feeley v. NHAOCG, LLC*, 2012 WL 5949209, at *8–10 (Del.Ch. Nov. 28, 2012).

146. Operating Agreement § 6.15. The term "Directors" is defined in Section 2.1 as "any Person who is a member of the Board of Directors of the Company."

for this reason, or solely because the Director or officer is present at or participates in the meeting of the Directors that authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if (a) the material facts as to the transaction are disclosed or are known to the disinterested Directors and. the contract or transaction is approved in good faith by the vote or written consent of the disinterested Directors; or (b) the transaction is fair to the Company or its Subsidiary as of the time it is authorized, approved or ratified by the Board of Directors or the Members.[147]

Providing scant attention to the parties' contracted-for standard of review, Zimmerman contends that Defendants must prove the entire fairness of the Challenged Transactions because a majority of the Board was interested when it approved them. Defendants counter that this Court need only determine that the Director Defendants reasonably believed their actions to be in the best interest of the Company and that they acted with the care, skill, and diligence of a person of ordinary prudence under Section 6.15. Alternatively, Defendants maintain that if they complied with either of the safe harbors in Section 6.13, which they contend they did, then Zimmerman bears the burden to prove that the Challenged Transactions were unfair and he failed to meet that burden.

▮ Preliminarily, I find that the parties, through the Adhezion Operating Agreement and consistent with their prerogative under 6 *Del. C.* § 18–1101(c), have "restricted" the fiduciary duties that the Director Defendants owed in the context of their dealings with the Company. The parties to this Operating Agreement defined the scope of director fiduciary duties in two ways: first, they set a general standard for fiduciary conduct; second, in Section 6.13, they gave directors the right to engage in transactions with the Company subject to certain requirements. The Court's role, therefore, is limited to determining whether the Director Defendants acted in compliance with their fiduciary duties as defined in Sections 6.13 and 6.15.

### 3. Standard of review for dealings with the Company

As is often true in our corporation law, a major issue in the resolution of this LLC dispute is determining the applicable standard of review, "[b]ecause our law has so entangled the standard of review with the ultimate decision on the merits that the two inquiries are inseparable." [148] One aspect of that determination involves examining the references to concepts of fairness in Section 6.13. The first sentence of that Section recognizes the rights of directors to engage in self-dealing transactions with Adhezion, "provided that such payments or fees are comparable to the payments or fees that would be paid to unrelated third parties providing the same property, goods, or services to the Company...." Similarly, the second means identified in the second sentence of Section 6.13 for precluding a self-dealing transaction from being deemed "void or voidable" is if "the transaction is fair to the Company or its Subsidiary as of the time it is authorized, approved or ratified by the Board of Directors or the Members." Delaware courts have interpreted similar provisions

---

147. Operating Agreement § 6.13.

148. *See In re Cysive, Inc. S'holders Litig.,* 836 A.2d 531, 547 (Del.Ch.2003) ("This case brings to the fore an aspect of our corporation law that is passing strange. Although the trial in this matter has already been held, a major aspect of the parties' post-trial briefs focuses on the standard of review I am to apply to decide this case.")

as effectively calling for review under an entire fairness standard.[149] That is, there must be a fair process and a fair price.[150]

A separate issue, however, is who has the burden of proof on the question of the fairness of a transaction. In the corporate context or in the case of a default fiduciary duty in the LLC context, the initial presumption would be that the director defendant would have the burden of proving the transaction was entirely fair to the company and its unitholders.[151] But, that presumption would not appear to apply in this case. The relevant fiduciary duties are defined in the Operating Agreement and, therefore, are contractual in nature. The first sentence of Section 6.13 confers on Directors the right to deal with the Company, provided those dealings are on terms comparable to an unrelated third-party transaction, *i.e.*, are entirely fair. I consider that sentence to be controlling in this case. Zimmerman contends the Director Defendants have breached their contractual fiduciary duties as to the Challenged Transactions. Therefore, Zimmerman would have the burden of proving a breach of the contractual requirement that the transactions be entirely fair.

For the reasons discussed *infra*, I find that Zimmerman has not shown that the Challenged Transactions were unfair. If the question of which party bears the burden of proof were free from doubt, that would end the discussion as to Plaintiff's breach of fiduciary duty claims. Regrettably, however, there may be some doubt regarding the appropriate allocation of the burden of proof on the facts of this case due, in part, to the second sentence of Section 6.13.

As in the case of the term "authorize," the second sentence of Section 6.13 appears to import certain concepts from Delaware corporate law into the LLC Operating Agreement. Specifically, the second sentence of Section 6.13 fairly closely tracks language from 8 *Del. C.* § 144.[152] Section 144, however, addresses

149. *See Auriga II*, 59 A.3d at 1213 ("To impose fiduciary standards of conduct as a contractual matter, there is no requirement in Delaware that an LLC agreement use magic words, such as 'entire fairness' or 'fiduciary duties.'").

150. *See id.* at 1213–15; *see also infra* Part II.B.4.

151. *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del.1995) ("If the [business judgment] rule is rebutted, the burden shifts to the defendant directors, the proponents of the challenged transactions, to prove to the trier of fact the 'entire fairness' of the transaction...."). The business judgment rule is rebutted if the plaintiff provides evidence that the directors, in reaching a challenged decision, are interested or breached any of their fiduciary duties. *Id.* at 1164; *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984) ("[The] protections [of the business judgment rule] can only be claimed by disinterested directors whose conduct otherwise meets the tests of business judgment.").

152. Section 144 of the DGCL states in relevant part:

(a) No contract or transaction between a corporation and 1 or more of its directors or officers, or between a corporation and any other corporation, partnership, association, or other organization in which 1 or more of its directors or officers, are directors or officers, or have a financial interest, shall be *void or voidable* solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee which authorizes the contract or transaction, or solely because any such director's or officer's votes are counted for such purpose, if:

(1) The material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

the common law rule or concept that self-interested transactions with a director's corporation were void or voidable.[153] That concept has no analogue in the LLC context.[154] Consequently, the apparent incorporation of corporate law concepts into Adhezion's Operating Agreement again creates unnecessary complication and potential confusion. Because the parties included this language, however, I must endeavor to give it meaning and avoid a construction that would render the sentence mere surplusage.[155]

Read in context, the second sentence of Section 6.13 appears to offer a party about to engage in a transaction with the Company a way to reduce the likelihood of, or exposure to, a future challenge. That is, the second sentence was intended to provide a safe harbor of sorts. It is less clear, however whether qualifying for such a safe harbor would result in the transaction receiving the benefit of the business judgment rule, or simply would shift the burden of proof to a future challenger of demonstrating that the transaction was not entirely fair, assuming that burden originally rested with the directors.[156] Regardless, as indicated *supra*, I conclude that a reading where the initial burden falls on the challenger to demonstrate that the defendant did not comply with Section 6.13 harmonizes the entire provision. If I were to place the initial burden of proof on the director, and not on a challenger, then one of two safe harbor options, option (b), would be redundant. A more reasonable reading places the burden on the party challenging compliance with the contractual standard. Under this reading, to decrease the likelihood that a challenger might succeed in demonstrating that a transaction was not comparable to a third-party transaction, the party engaging in a transaction with the Company could either obtain the good faith, informed approval of the disinterested directors or attempt to establish *ex ante* the fairness of the trans-

. . .

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified, by the board of directors, a committee or the stockholders.

8 *Del. C.* § 144 (emphasis added).

**153.** *See* Blake Rohrbacher, John Mark Zeberkiewicz, Thomas A. Uebler, *Finding Safe Harbor: Clarifying the Limited Application of Section 144*, 33 Del. J. Corp. L. 719 (2008).

**154.** *See Feeley v. NHAOCG, LLC*, 2012 WL 4859132, at *11 (Del.Ch. Oct.12, 2012) ("Nothing about the [LLC Act] suggests a desire on the part of the General Assembly to transplant into a new and flexible form of entity an old and rigid common law rule that had been displaced substantially over the prior century, first by private ordering and later by statute.").

**155.** *See NAMA Hldgs., LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del.Ch. 2007) (citing *Majkowski v. Am. Imaging Mgmt. Serv.*, 913 A.2d 572, 588 (Del.Ch.2006)).

**156.** Defendants contend that, at a minimum, compliance with the requirements of a safe harbor under Section 6.13 would create a burden shift to Zimmerman to prove unfairness. Zimmerman apparently agrees with this interpretation. Pl.'s Answering Br. in Opp'n to Defs.' Mot. for Summ. J. 32 n. 20 ("At most, compliance with [Section 6.13's] terms can only shift the burden of proof to plaintiff, not restore the business judgment rule entirely."). The effect of compliance with one of the three subsections of Section 144(a) of the DGCL on the appropriate standard of review for an otherwise self-interested corporate transaction has been the subject of numerous prior decisions in Delaware, as well as scholarly commentary. *See, e.g., Benihana of Tokyo, Inc. v. Benihana, Inc.*, 906 A.2d 114, 120 (Del.2006); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 366 n. 34 (Del. 1993); *Marciano v. Nakash*, 535 A.2d 400, 405 n. 3 (Del.1987); Rohrbacher et al., *supra* note 153. For purposes of this LLC case, however, I do not consider it necessary or productive to delve into those issues.

action, for example, by engaging in a robust market check and obtaining a fairness opinion.

This Court and the Delaware Supreme Court recently considered a somewhat different LLC Agreement provision.[157] In that case, this Court found, and the Supreme Court affirmed, that the burden of proving the fairness of the self-dealing transaction at issue fell upon the LLC manager. Unlike Section 6.13 in this case, which expressly provides that directors "shall have the right to contract or otherwise deal with the Company" subject only to a proviso that related payments or fees be comparable to those in unrelated third-party transactions for the same property or services, the following provision was at issue in *Auriga:*

> Neither the Manager nor any other Member shall be entitled to cause the Company to enter … into any additional agreements with affiliates on terms and conditions which are less favorable to the Company than the terms and conditions of similar agreements which could be entered into with arms-length third parties, without the consent of a majority of the non-affiliated Members (such majority to be deemed to be the holders of 66–2/3% of all Interests which are not held by affiliates of the person or entity that would be a party to the proposed agreement).[158]

The *Auriga* provision provides that a manager or member *cannot* cause the company to enter an agreement with an affiliate on terms less favorable than an arm's length transaction without the required consents. By contrast, Section 6.13

gives members, directors, or officers the affirmative right to engage in transactions with the Company, provided that such transaction is comparable to a third-party transaction. For this reason, I find the Adhezion Operating Agreement provision to be distinguishable from the *Auriga* provision.

Additionally, under reasoning analogous to the Supreme Court's discussion in *Auriga,* the application of the business judgment rule could be appropriate in this case. In *Auriga,* the Supreme Court affirmed this Court's holding that the defendant—the manager who had entered into a self-dealing transaction with the company without the consent of 66–2/3% of the non-affiliated members—had the burden to prove the entire fairness of the transaction. In addition, the Supreme Court discussed what result would obtain if "counterfactually[ ], [the defendant] had conditioned the transaction upon the approval of an informed majority of the nonaffiliated members."[159] It concluded that, with such an approval, the transaction at issue—the sale of the LLC—"would not have been subject to, or reviewed under, the contracted-for entire fairness standard."[160] In addition, the Court observed that such a result "contrasts with the outcome that [ ] would obtain in the traditional corporate law setting, where an informed majority-of-the-minority shareholder vote operates to shift the burden of proof on the issue of fairness."[161] Although the Supreme Court's discussion on this point constitutes only dicta, I read it as suggesting, in effect, that the business judgment rule

157. *See Auriga II,* 59 A.3d 1206, 1212–15 (Del.2012); *Auriga I,* 40 A.3d 839 (Del.Ch. 2012).

158. *Auriga I,* 40 A.3d at 857.

159. *Auriga II,* 59 A.3d 1206, 1213.

160. *Id.*

161. *Id.* at 1213 n. 20 (citing *Kahn v. Lynch Commc'n Sys., Inc.,* 638 A.2d 1110, 1117 (Del. 1994))

might apply in a case such as the one currently before me if the Director Defendants complied with one of Section 6.13's two safe harbors.

■ I conclude that Defendants here did comply with the first of the safe harbors in Section 6.13. At least two of Adhezion's directors, Toni and Bryant, were disinterested and they gave their informed good-faith approval of the Challenged Transactions. Neither Bryant nor Toni participated in, or stood to gain a personal financial benefit from, any of the Challenged Transactions.[162] Likewise, none of the allegations or evidence presented supports a finding that Bryant or Toni acted to perpetuate their tenure on the Board.[163]

Furthermore, I find that Bryant and Toni are independent of Molinaro, who arguably was interested in the Challenged Transactions.[164] In the Summary Judgment Opinion, I found that "Zimmerman's allegations of mere friendship and shared

work experience likely fall short of what is necessary to call into question the independence of Toni or Bryant."[165] The evidence presented at trial did not go beyond the allegations that I assumed to be true for purposes of the Summary Judgment Opinion. Molinaro and Bryant worked closely together and served on the same boards of directors periodically since the 1980s.[166] Molinaro and Toni also had worked together at Cilco for several years.[167] Molinaro characterized Bryant as "a long time friend and business associate" and they socialized together occasionally.[168] This evidence demonstrates that Molinaro and Bryant have extensive shared work experience and a personal friendship. The record as a whole, however, did not show that Bryant was beholden to Molinaro or otherwise unable to exercise his own independent business judgment.[169] There is even less evidence for the proposition that Toni was not independent of Molinaro. I conclude, therefore, that both Toni and

162. *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984).

163. *See Grobow v. Perot*, 539 A.2d 180, 188 (Del.1988) (citing *Aronson* for the proposition that director interestedness requires "either a financial interest or entrenchment"), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253 (Del.2000).

164. Molinaro participated in each of the Challenged Transactions. But the parties dispute whether the transactions conveyed a benefit to Molinaro that was not open to unitholders generally and whether Molinaro's participation in the Challenged Transactions was material to him. *See Orman v. Cullman*, 794 A.2d 5, 25 n. 50 (Del.Ch.2002). Zimmerman further argues that Molinaro was not independent of Liberty and Originate. Because I find it unnecessary to resolve these disputes, I assume, without deciding, that Molinaro was interested.

165. *Zimmerman v. Crothall*, 2012 WL 707238, at *13 (Del.Ch. Mar. 27, 2012); *see also Beam v. Stewart*, 845 A.2d 1040, 1050 (Del.2004)

("Allegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence"); *id.* at 1051 (stating that director's independence may be doubted when a relationship is one of "financial ties, familial affinity, a particularly close or intimate personal or business affinity or ... evidence that in the past the relationship caused the director to act non-independently vis-à-vis an interested director").

166. *See* Tr. 289–95 (Molinaro); Tr. 377 (Bryant).

167. Tr. 289 (Molinaro).

168. Tr. 295 (Molinaro); JX 28.

169. *Benerofe v. Cha*, 1996 WL 535405, at *7 (Del.Ch. Sept. 12, 1996) ("A director is 'independent' if that director is capable of making decisions for the corporation based on the merits of the subject rather than 'extraneous considerations or influences.'" (citing *Aronson*, 473 A.2d at 816)).

Bryant are not only disinterested but also are independent of Molinaro.

Additionally, the material facts as to the transactions were "disclosed or [we]re known to" Toni and Bryant. Both men testified that they reviewed financial statements and other documents related to the Challenged Transactions.[170] They both attended Board meetings at which the Challenged Transactions were discussed.[171] Both directors also credibly testified that they approved the Challenged Transactions because they believed them to be fair to and in the best interest of the Company.[172] I find, therefore, that the Challenged Transactions were approved in good faith by the informed disinterested directors and, thus, arguably, should receive the benefit of the business judgment rule. At a minimum, however, the burden of proof on entire fairness would shift to Zimmerman, even assuming he did not bear that burden already under the first sentence of Section 6.13.

### 4. The Challenged Transactions were comparable to unrelated third-party transactions and were entirely fair

I consider next whether Zimmerman has proven by a preponderance of the evidence that the Challenged Transactions were *not* comparable to unrelated third-party transactions for similar property. I conclude that he has not. It follows, therefore, that Plaintiff could not meet his burden of proof if Defendants were entitled to the presumption of the business judgment rule. I review below the factual and expert evidence on whether the Challenged Transactions were entirely fair. My analysis proceeds from the premise that Zimmerman bears the burden of proof. Nevertheless, I also find that the record in this case is sufficiently strong that, regardless of which party bears the burden of proof, the Challenged Transactions were comparable to unrelated third-party transactions for the same property and, thus, were fair to the Company.

#### a. Factual evidence

The entire fairness standard includes two non-bifurcated components: fair price and fair dealings.[173] Moreover, this Court has recognized that "where claims for unfair dealings do not rise to the level of fraud ... the Court should primarily focus on whether the price was unfair."[174]

It is undisputed that, at the time of the Challenged Transactions, Adhezion needed money to continue its business. Before the Challenged Transactions, the Company repeatedly sought financing and obtained it from Originate in March 2008 ($3 million) and from Liberty in October 2008 ($2 million). These cash infusions did not sustain the Company for long. The continuing need for cash is not surprising and is consistent with Toni's experience at Closure, a company Plaintiff identifies as comparable to Adhezion. Closure secured $10 million from angel investors in 1994. In 1996, Closure received $4.5 million from J & J upon entering an exclusive agreement with that company and raised $15 million

---

170. Tr. 554 (Toni); Bryant Dep. 33–34, 65.

171. *See, e.g.,* JX 67 (Bryant and Toni attended April 30, 2009 Board meeting); JX 117 (Bryant attended September 29, 2009 Board meeting); JX 194 (Bryant and Toni attended January 15, 2010 Board meeting).

172. Tr. 367 (Bryant); Tr. 528 (Toni).

173. *See Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162–63 (Del.1995) (quoting *Weinberger v. UOP, Inc.,* 457 A.2d 701, 711 (Del.1983)).

174. *ONTI, Inc. v. Integra Bank,* 751 A.2d 904, 930 n. 108 (Del.Ch.1999) (citing *Weinberger,* 457 A.2d at 711).

in a public offering. By 1996, Closure had spent $10 million.[175] In 1997, Closure raised another $10 million in a second public offering.

The evidence demonstrates that Adhezion actively pursued other possible sources for additional funds without success. Zimmerman persistently argues that Molinaro stopped looking for funds from other sources because Originate and Liberty ordered him to do so. He implies that those entities insisted on supplying any necessary funding for the Company to avoid diluting their stake in Adhezion's considerable upside potential. The evidence shows, however, that the "order" to stop fundraising was a reasonable directive from the Board at a time when the Company was quite desperate for a distribution partner to increase its sales force. The Board wanted Molinaro to focus on finding such a partner in the wake of 3M having withdrawn from the field.

Toni testified that Closure's distribution relationship with J & J was critical to its success.[176] Although Adhezion's Board had considered building a sales team itself, it ultimately chose to take a route similar to Closure's and try to find a strategic partner like J & J.[177] At the time, Medline was still a possible partner. Moreover, Originate had limited additional funds it was willing to invest in Adhezion. According to Gausling, Originate was "looking for someone else to take the lead, that we would participate ... to say that, you know, we're committed, we'll add capital but we didn't want to be the lead going forward."[178] Gausling's contemporaneous solicitation of Safeguard Scientific corroborates his testimony.[179]

Adhezion also had limited funding options because it was a risky investment. The Company was not performing at the level the parties anticipated when Originate originally invested[180] For example, as part of the deal with Originate, Zimmerman entered into an employment agreement with seven milestones. Zimmer-

175. Tr. 507 ("Q: So you had $29.5 million of capital to fund your investment by 1996? A: Yes. Now, we had burned 10 million by the time we—by '06 [sic], we had already burned through 10").

176. Tr. 510–11 ("Q. With your experience in Adhezion, tell me, do you regard it as the next Closure? A. No, not at all. You know, first of all, they are so strapped in terms of cash, availability of cash, to try and build the business. How do they compete with J & J? How do they distribute their product? ... You need a pipeline.").

177. Tr. 511 (Toni) ("Q. With all the money [Closure] raised [$39.5 million], why did you go to Johnson & Johnson rather than develop your own channels of distribution? A. [W]e realized that we never could be able to raise enough money to compete with 200 sales reps. How could we build a 200–sales–rep organization to compete with Ethicon, [J & J's division that sells Dermabond]?"); Tr. 440 (Gausling) ("[W]e, as a collective board, took a strategy that we would go with a corporate partner for distribution versus building a

sales team ourselves."). Gausling further explained: "[T]hat's the value drivers for any investor to look at, is how's the business doing and we needed—need strategic partners or some revenue traction or some clarity on the patent situation." Id.

178. Tr. 439.

179. JX 130; see also Tr. 442 (Gausling).

180. Gausling ascribed the increased riskiness of the Adhezion investment over time to three main reasons: (1) Adhezion needed more money within twelve months of Originate's investment; (2) Zimmerman met only two of his seven performance milestones; and (3) the budgeted revenues for 2008 ($5.6 million) dwarfed the actual revenues ($140,000). Tr. 436–38. Zimmerman does not dispute that he failed to meet many of the milestones in his employment agreement, except to note that Adhezion achieved a third milestone fifteen days after his termination. Tr. 112.

man's employment was terminated when he failed to meet most of those milestones. Gausling testified that

> many of the items that [Zimmerman] specifically said were the value drivers going forward, we put in a performance milestone in his employment agreement, seven items.... [I]f he hit those value drivers, then the company would have done what he said it was going to do. He hit two of the seven during that period in time.... [H]e had alleged that we would get all seven of those. We got two.[181]

The threat of patent infringement litigation was another looming risk that developed in 2009.[182] One company threatening litigation was J & J, Adhezion's main competitor. J & J had significant resources and every incentive to pursue a patent infringement lawsuit against its competitor Adhezion's product SurgiSeal. In fact, the possibility that Adhezion was infringing J & J's patent dampened 3M's enthusiasm for entering into a distribution agreement with Adhezion.[183] It also influenced Medline's decision not to pursue a license and distribution agreement with Adhezion.

After the Medline transaction fell through, Adhezion embarked on a reformulation of its sterilization process in an effort to design around J & J's patent. During the reformulation, Adhezion did not produce SurgiSeal.[184] Still, Molinaro continued to seek outside investors. He recognized, however, that because the threat of patent infringement litigation had caused the Company to cease production of its main product, there "wasn't much

chance of actually securing someone if they did their due diligence." [185]

Zimmerman also emphasizes that the Board did not negotiate to obtain better terms for the Company than those initially presented by Crothall. There is no evidence, however, that any of the directors believed the terms were unfair to Adhezion. Although Molinaro raised an objection to the amount of warrants being granted in the February 2010 Issuance, he ultimately agreed to the original terms. Indeed, he testified that he "always felt that the valuation of the company and the share price was generous." [186]

In the context of all the evidence, Molinaro's failure to obtain a modification of the number of warrants granted in the February 2010 Issuance does not alter my conclusion that this Issuance and the other Challenged Transactions were comparable to third-party transactions. Despite reasonable efforts on behalf of Adhezion to find additional investors, I find that no third party was willing to invest in the Company on terms more favorable to Adhezion. The Kensey Nash offer in November 2009 to buy Adhezion was for $10 million, but only $4 million of that was firm. The fact that the Adhezion Board effectively rejected that offer by making a much higher counteroffer that sought, in part, a firm commitment of $20 million does not warrant a different conclusion. No serious negotiations with Kensey Nash ever took place in the succeeding years. Additionally, Zimmerman sold a significant amount of his shares for only $2 per unit

---

181. Tr. 437.

182. Tr. 246–47 (Molinaro); JX 48, January 8, 2009 Letter from Medlogic to Adhezion regarding potential patent infringement.

183. Tr. 251 (Molinaro).

184. The Company sold out its existing inventory of SurgiSeal by extending the shelf life. Tr. 282 (Molinaro).

185. Tr. 270.

186. Tr. 335.

just three months after the February 2010 Issuance.

### b. Expert evidence

Defendants Expert, Roy D'Souza, opined that all four Challenged Transactions were fair.[187] Zimmerman's expert, Dr. Helen Bowers, opined that the February 2010 Issuance was unfair but did not seriously question the fairness of any of the other Challenged Transactions.[188] Bowers calculated Adhezion's value to be no less than $15.63 million in February 2010.[189] The February 2010 Issuance valued the Company at $13 million.[190] In her Expert Report, however, Bowers admittedly made a troubling number of computational errors, which Defendants' expert, D'Souza, later identified.[191] To account for these errors, and to make additional corrections, Bowers submitted a Supplemental Expert Report.[192] In any case, D'Souza convincingly pointed out in his rebuttal report and at trial several ways in which Bowers's analysis overstates Adhezion's value and understates the attendant risks.[193]

One point the parties strenuously dispute is the value of the warrants issued in the February 2010 Issuance. Defendants contend they had no value because, in their view, the Company's unit price was below the $4 warrant strike price.[194] Bowers, on the other hand, valued the warrants at a

---

187. JX 370; JX 372.

188. Bowers stated that, although she did not perform an analysis for the other three Challenged Transactions, "in the analysis [she] did in this whole matter—[she] did not find anything that would cause [her] to suspect that they were unfair." Tr. 151; *see also* JX 369, Bowers's Expert Report; JX 371, Bowers's Rebuttal Report; JX 376, Bowers's Supplemental Expert Report. Bowers did state in her Rebuttal Report, however, that D'Souza overstated Adhezion's value due to mistakes and errors, and that his calculated valuation "does not support a determination of fairness nor does it support that the disputed transactions were fair." JX 371 at 6, 25–26. As the party with the burden of proof to show that the other Challenged Transactions were unfair, Zimmerman's general criticisms of those transactions, without the benefit of any expert analysis, were insufficient to meet his burden. Furthermore, Defendants' expert credibly concluded that "the capital raising activities of Adhezion during 2009–2011 were fair and reasonable." JX 370, Expert Report of Roy P. D'Souza, at 71.

189. JX 376 at 4. Bowers's discounted cash flow ("DCF") model yielded a value of $16.18 million and her comparable companies, or relative, valuation yielded a value of $13.97. In arriving at a valuation of $15.63, she gave her DCF model 75% weight and her relative valuation 25% weight.

190. Tr. 273 (Molinaro). In February 2010, the total number of Adhezion units if all outstanding warrants and options were exercised was 3,249,633. Tr. 585–88 (D'Souza). This number multiplied by the $4.00 per unit price equals $12,998,532.

191. *See* JX 372.

192. JX 376.

193. *See* JX 372 at 9–11 (discussing size risk, legal risks, and regulatory risks). The parties disagree, for example, on how to characterize the Company. Defendants call it an "early-stage" medical products company. Defs.' Answering Post–Trial Br. ("Defs.' AB") 1; Tr. 431 (Gausling). Zimmerman describes Adhezion as a "growth-stage" company, and his expert appears to use that characterization to justify assigning less risk to the Company than Defendants' expert did. Pl.'s Opening Post–Trial Br. ("Pl.'s OB") 1; Pl.'s Reply Post–Trial Br. ("Pl.'s RB") 17; JX 369, Expert Report of Dr. Helen M. Bowers, 8–9 (describing an "expansion-stage" company as one that has products in production, has products that are commercially available, and is experiencing revenue growth though it may not yet show a profit). In the circumstances of this case, I find Defendants' characterization of Adhezion as an early-stage company slightly more appropriate.

194. Tr. 606–07 (D'Souza); Tr. 517–18 (Toni).

$4.29 per unit.[195] Among other things, Bowers used the Black–Scholes method to arrive at this value. Although the Black–Scholes model is a formula for option valuation that is "widely used and accepted by industry figures and regulators,"[196] the model overstates the value of options "which are not liquid, freely tradeable options."[197] Adhezion's warrants are not publicly traded. Therefore, I find Bowers's reliance on the Black–Scholes formula to value Adhezion's warrants to be questionable, if not entirely misplaced.

Bowers used two analytical methods to determine a fair value range for Adhezion: a DCF analysis and a comparable companies analysis. For her comparable companies analysis, Bowers relied, in part, on the 37.6 multiple of enterprise value/EBIT paid by J & J to acquire Closure.[198] The differences between Closure when it was sold to J & J and Adhezion in February 2010, however, are stark. Unlike Closure, Adhezion had no distribution partner, faced a substantial risk of IP litigation, had raised relatively little cash, and would be the third company to enter the market, after the first entrant, J & J, and a new competitor, Medline.[199] Based on these significant differences, I find that Bowers's reliance on Closure as a "firm very similar to Adhezion" was unreasonable.[200] In summary, having considered Bowers's expert reports and testimony, as well as Plaintiff's other evidence, I find that Zimmerman has failed to prove any of the

Challenged Transactions were less than entirely fair. Based on the same reasons discussed in this Part II.B, I also would find the Challenged Transactions to be entirely fair if Defendants bore the burden on that issue.

## C. Aiding and Abetting

▮ To succeed on a claim for aiding and abetting a breach of fiduciary duty, Plaintiff must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) knowing participation in that breach by the non-fiduciary.[201] Because the Director Defendants did not breach their fiduciary duties, Zimmerman cannot succeed on his claim against Defendants Originate, Liberty, and Morse for aiding and abetting a breach of fiduciary duty. I therefore find for Defendants on Plaintiff's claim for aiding and abetting.

## D. Remedy

Having concluded that Zimmerman is entitled to judgment in his favor on the breach of contract claim but not on the breach of fiduciary duty and aiding and abetting claims, I consider what remedy is appropriate in the circumstances of this case. Zimmerman proposes that the Court reform the terms of the Challenged Transactions. He requests, first, that the Court cancel (1) all the warrants issued and (2) all the options issued pursuant to the 2010 employee option grant. Second,

195. Tr. 142 (Bowers); Tr. 601 (D'Souza).

196. *In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 705 n. 42 (Del.2005).

197. *Louisiana State Employees' Retirement Sys. v. Citrix Sys., Inc.,* 2001 WL 1131364, at *7 (Del.Ch. Sept. 19, 2001); *see also Lewis v. Vogelstein,* 699 A.2d 327, 331 (Del.Ch.1997) (noting that Black–Scholes "assumes that the options being valued are issued and publicly-traded"); Tr. 598 (D'Souza).

198. *See* JX 369 at 4; Pl.'s OB 30; *see also* JX 372 at 18.

199. *See* Tr. 502–09 (Toni).

200. JX 369 at 4.

201. *Allied Capital Corp. v. GC–Sun Hldgs., L.P.,* 910 A.2d 1020, 1039 (Del.Ch.2006).

he requests that Defendants be deemed to have received, for each transaction, promissory notes at 10% interest, with no ability to convert into equity, redeemable five years from the date of judgment.

■ The remedy of reformation typically is used to conform a document to the parties' intent in cases of mutual mistake or fraud.[202] It also can be used to remedy a breach of fiduciary duty, in which case the court has broad authority to fashion an appropriate remedy.[203] Based on the circumstances of this case, however, I do not consider the reformation proposed by Zimmerman to be an appropriate equitable remedy. Rather than rectify wrongdoing and avoid an unjust enrichment, the proposed reformation would create a windfall for Zimmerman.[204] Adhezion needed the funds that Defendants provided in each of the Challenged Transactions. Zimmerman effectively concedes this point and does not request that the Court rescind the transactions. Instead he asks the Court to allow the Company to keep Defendants' money on different terms. Yet, no evidence suggests that Defendants would have invested in Adhezion on Zimmerman's proposed terms.

■ In this case, where Defendants have not breached their fiduciary duties, an appropriate remedy would permit Plaintiff to recover any damages he suffered as a result of the Director Defendants' breach of the Operating Agreement.

Having concluded that none of the Challenged Transactions has been shown to have been unfair to Adhezion, however, I find that there are no such damages. The Challenged Transactions provided the Company with crucial capital on fair terms. The dilution Zimmerman suffered was in exchange for maintaining some value to his investment in Adhezion. In this Opinion, therefore, I declare that the parties' rights under the Operating Agreement are as discussed in Part II.A, *supra*, but otherwise decline to award any damages beyond nominal damages of $1.

### E. Attorneys' Fees

■ Zimmerman also asks this Court to order Defendants to reimburse the Company for $1,011,559 in legal fees that it advanced to Pepper Hamilton while that firm acted as counsel to Defendants, and not the Company. Zimmerman challenges the legality of this advancement. Whether a party has the ultimate right to an advancement depends on whether his underlying conduct is indemnifiable.[205]

The LLC Act defers completely to the contracting parties "to create and delimit rights and obligations with respect to indemnification and advancement of expenses."[206] Because of this deference, this Court has stated a preference for "interpret[ing] language so as to achieve where possible the beneficial purposes that indemnification can afford."[207]

**202.** *Waggoner v. Laster*, 581 A.2d 1127, 1135 (Del.1990).

**203.** *In re Loral Space & Commnc'ns Inc.*, 2008 WL 4293781, at *33 n. 161 (Del.Ch. Sept. 19, 2008).

**204.** *Id.*

**205.** *Reddy v. Elec. Data Sys. Corp.*, 2002 WL 1358761, at *5 (Del.Ch. June 18, 2002).

**206.** *See Delphi Easter P'rs Ltd. P'ship v. Spectacular P'rs, Inc.*, 1993 WL 328079, at *2 (Del.Ch. Aug. 6, 1993) (interpreting a section of the Delaware Revised Uniform Limited Partnership Act ("DRULPA"), 6 *Del. C.* § 17–108, which similarly allows a partnership to "indemnify and hold harmless any partner or other person from and against any and all claims and demands whatsoever").

**207.** *Id.* at *2.

■ Adhezion's Operating Agreement creates broad indemnification rights for directors in Section 6.17:

*The Company shall indemnify and hold harmless each Director to the fullest extent permitted by law from all liabilities, losses, costs, expenses and/or damages (including without limitation reasonable attorneys' fees) and for judgments and amounts paid in settlement of an action, suit or proceeding in which such Director is or was a party, or threatened to be made a party, by reason of such Director's relationship with the Company, unless there has been a final adjudication in the action, suit or proceeding or, in the event of settlement of the action, suit or proceeding, counsel to the company is of the opinion that the Director's act or omission was not taken or made in good faith within the scope of this Agreement and was the result of gross negligence, willful misconduct or fraud on the part of the Director. The foregoing right of indemnification shall be in addition to any other rights to which the Directors may otherwise be entitled,* including, without limitation, as a result of any indemnification agreement entered into between the Directors and the Company, and shall inure to the benefit of the successors, assigns, executors, administrators and personal representatives of the Directors.[208]

This provision requires indemnification for directors unless there has been a final adjudication that the directors' acts were both "not taken or made in good faith within the scope of this Agreement" and were "the result of gross negligence, willful misconduct or fraud on the part of the Director."[209] In this Opinion, I have concluded that the Director Defendants breached the Agreement by failing to obtain the approval of the Common unitholders for the Challenged Transactions. Zimmerman has not shown, however, that any of the Defendants' actions in connection with the Challenged Transactions either were not taken in good faith or resulted from gross negligence, willful misconduct, or fraud. Thus, the Agreement requires indemnification for the Director Defendants in the circumstances of this case.[210]

---

**208.** Operating Agreement § 6.17 (emphasis added). Plaintiff does not challenge the reasonableness of the attorneys' fees advanced. I therefore do not consider that issue.

**209.** *Id.*

**210.** In addition to the indemnification provision in the Operating Agreement, the Company also entered into indemnification agreements with at least directors Molinaro and Crothall. Although Defendants assert that "Adhezion entered into indemnification agreements with each of [the] directors," they cited only two exhibits in support of this assertion. Defs.' AB 49 (citing JX 40 (Crothall Indemnification Agreement) and JX 43 (Molinaro Indemnification Agreement)). These agreements expressly address "Advancement of Expenses" and provide that the Company will advance expenses incurred by the contracting director after the director submits a statement requesting the advance *and* a written undertaking. There is no evidence, however, that any director provided an oral or written undertaking to the Company. *See Carlson v. Hallinan*, 925 A.2d 506, 541 (Del. Ch.2006) (finding that 8 *Del. C.* § 145 permits an undertaking to be in oral or written form). In the corporate context, this Court held in *Carlson v. Hallinan* that a company's advancement of directors' litigation expenses without the directors first submitting an undertaking was *ultra vires*. *Id.* Nevertheless, the Court noted that the directors still could "apply to this Court, pursuant to 8 *Del. C.* § 145(b), for indemnification." *Id.* at 542 n. 240. In light of the extensive findings of wrongdoing and liability by Defendants in *Carlson*, however, the Court required the directors to repay the advanced funds to the company pursuant to both 8 *Del. C.* § 145(b) and § 145(e). Because Defendants are entitled to indemnification in this case, I reach a different result.

An indemnification provision also appears in the February 2010 Purchase Agreement.[211] Defendants Originate, Crothall, Liberty, and Molinaro are parties to this agreement. Its indemnification provision states in relevant part:

> (b) The Company shall indemnify, defend and hold harmless each Indemnified Party[212] against any and all direct costs, fees, expenses and monetary damages of such Indemnified Party resulting directly from or arising directly out of any third party or governmental action or claim brought against such Indemnified party, primarily relating to the Indemnified Party's status as a security holder, board observer, or as a director of the Company. . . .[213]

This provision provides security holders of Adhezion broad indemnification for expenses arising directly out of any "third party action." Adhezion is both a party to this action as a nominal defendant and a party to the February 2010 Purchase Agreement. Arguably, therefore, Zimmerman's derivative claim brought on behalf of Adhezion is not a "third party action."

Subsection (a) of the above-quoted Section 6.1 directly addresses derivative actions. It provides for indemnification of expenses arising out of or related to any derivative action "based upon, resulting from, relating to or arising out of any misrepresentation or breach of any representation, warranty, covenant or agreement by the Company in any Transaction Document."[214] One such representation and warranty by the Company is that the Company "has all power and authority . . . (b) to execute, deliver and perform this Agreement . . . and the Operating Agreement."[215] At a minimum, Plaintiff's breach of contract and breach of fiduciary duty claims "relate to" the Company's breach of this representation and warranty. I conclude, therefore, that either through Section 6.1(a) or 6.1(b) of the February 2010 Purchase Agreement, the non-Director Defendants also are entitled to indemnification.

Having concluded that Defendants are entitled to indemnification, whether Defendants also have a right to advancement is largely moot at this stage in the litigation.[216] Plaintiffs counsel effectively acknowledged as much at oral argument.[217] Furthermore, the Operating Agreement confers upon the Board the authority to "make all decisions and take all actions for

**211.** JX 224 art. 6.

**212.** The agreement defines "Indemnified Party" to include "the Purchasers and their affiliates and their respective officers, directors, trustees, agents, representatives, employees, partners and controlling persons." *Id.* § 6.1(a). This broad definition would include Defendant Morse as an agent of Liberty.

**213.** *Id.* § 6.1(b). This provision contains a carve-out for claims resulting from a party's grossly negligent or willful misconduct, but it is not relevant here.

**214.** *Id.* § 6.1(a).

**215.** *Id.* § 3.1.

**216.** To avoid this result, Zimmerman could have sought, for example, to have this question resolved in advance of trial pursuant to 6 *Del. C.* § 18–111, which permits this Court to "interpret, apply or enforce the provisions of a limited liability company agreement." *See Morgan v. Grace,* 2003 WL 22461916, at *1 (Del.Ch. Oct. 29, 2003) ("The value of the right to advancement is that it is granted or denied while the underlying action is pending.").

**217.** Sept. 14, 2012 Post–Trial Oral Arg. Tr. 47 (*"To the extent the Court finds for Plaintiff,* [we request] that it order repayment of advanced attorneys' fees as no longer permitted." (emphasis added)).

the Company not otherwise provided for in this Agreement." [218] Therefore, even though the Operating Agreement does not explicitly address advancement rights, the Board had the authority to approve the advancement of Defendants' legal fees. Because I find that Defendants have not breached the fiduciary duties they owe to the Company or to Zimmerman, I also see no basis for invalidating the Board's decision to advance Defendants' legal fees. Indeed, that decision appears to comport with the Operating Agreement's requirement that the Company indemnify its directors "to the fullest extent permitted by law." [219]

Thus, I deny Plaintiff's request for an order directing Defendants to reimburse the attorneys' fees advanced on their behalf by the Company.

218. Operating Agreement § 6.1(a).

219. *Id.* § 6.17. The comparable language under Section 6.1(b) of the February 2010 Purchase Agreement is less broad, but still supports the same conclusion as to the non-Director Defendants. That Section requires the Company to indemnify parties to that

## III. CONCLUSION

For the foregoing reasons, I find that the Director Defendants breached the Operating Agreement by entering into the Challenged Transactions without obtaining the approval of the Common unitholders. But, I find that the breach caused no damage to Zimmerman and, therefore, award only nominal damages of $1. I further find that Defendants did not breach any fiduciary duties and that, therefore, there can be no liability for aiding and abetting such a breach. Defendants promptly shall submit, on notice, an appropriate form of final judgment.

agreement "against any and all direct costs, expenses and monetary damages of such Indemnified Party resulting directly from or arising directly out of [a claim] primarily relating to the Indemnified Party's status as a security holder." JX 224 § 6.1(b).