**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**


| | | |
|---|---|---|
| EILEEN MASTERSON-CARR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. N12C-11-107 MJB |
| | ) | |
| ANESTHESIA SERVICES, P.A., | ) | |
| MARK SCHNEIDER, M.D., and | ) | |
| KEN SILVERSTEIN, M.D., | ) | |
| | ) | |
| Defendants. | ) | |


Submitted:  June 18, 2014
Decided: September 25, 2014


<u>**DECISION AFTER TRIAL**</u>



Michele D. Allen, Esq., Law Offices of Michele D. Allen, LLC, *Attorney for Plaintiff*

Laurence V. Cronin, Esq., Smith, Katzenstein & Jenkins LLP, *Attorney for Defendant*



**BRADY, J.**

## I. INTRODUCTION

Eileen Masterson-Carr ("Plaintiff") filed the instant case against Anesthesia Services P.A. ("ASPA"), Mark Schneider M.D. ("Schneider"), and Ken Silverstein M.D. ("Silverstein") (collectively "Defendants") on November 13, 2012, alleging the following claims: (1) ASPA breached her Employment Contract; (2) ASPA breached the implied covenant of good faith and fair dealing; (3) Plaintiff was defamed by members of ASPA, including Silverstein and Schneider; (4) ASPA violated the Delaware Wage Payment and Collection Act by failing to pay Plaintiff her 6.5% bonus for time worked in 2012; (5) Silverstein and Schneider tortuously interfered with Plaintiff's Employment Contract; and (6) ASPA acted in a way justifying promissory estoppel. On March 21, 2013, upon Defendant's motion, the Court dismissed Plaintiff's promissory estoppel claim. Subsequently, on March 18, 2014, Plaintiff stipulated to the dismissal of her claim for breach of the implied covenant of good faith and fair dealing. Plaintiff also agreed to withdraw her request for punitive damages.

The parties elected to have a bench trial.[1] Trial began on April 3, 2014 and ended on April 7, 2014. Following closing arguments, the Court ruled that Plaintiff was entitled to her 6.5% bonus for time worked in 2012 but reserved decision regarding the specific amount to which Plaintiff is entitled. The trial transcript was produced on May 20, 2014.[2] Post-trial submissions were received and the matter was submitted to the Court for decision on June 18, 2014.

---

[1] The parties submitted a Joint Exhibit Binder. Exhibits from the Joint Exhibit Binder shall be cited as "Ex."
[2] The transcript of April 3, 2014 will be cited as "T1." The transcript of April 4, 2014 will be cited as "T2." The transcript of April 7, 2014 will be cited as "T3."

As explained at the conclusion of trial, the Court will now issue a ruling on the issues of whether Plaintiff was terminated or resigned and Plaintiff's entitlement to her 6.5% bonus.[3] The Court finds that Plaintiff was not terminated. As a result, Plaintiff's claim for Breach of Contract based on ASPA's alleged failure to follow proper termination protocol is **MOOT**.

At trial, Plaintiff suggested that even if the Court were to find that Plaintiff technically resigned, Plaintiff could still be found to have been "constructive[ly] discharged."[4] The Court reserved judgment on the constructive discharge issue until after the Court's finding of fact on the issue of whether Plaintiff was discharged or resigned.[5] As the Court now finds that Plaintiff resigned, the Court will allow the parties additional briefing on the issue of constructive termination. Because the Court finds that the issue of Plaintiff's alleged constructive termination is intertwined with the remaining claims for tortious interference and defamation, the Court will also reserve decision on those issues until the parties have submitted additional briefing.

## II. BACKGROUND

### A. Parties

ASPA is a professional services corporation, organized under the laws of Delaware, that is involved in the practice of medicine.[6] ASPA is comprised of approximately thirty-one physicians, some of whom are shareholders, as well as other medical personnel, including nurses. The company's Board of Directors ("Board") is composed of shareholder-members of

---

[3] T3 at 235.
[4] T3 at 197.
[5] T3 at 234.
[6] Ex. 4, Employment Agreement, at 1.

ASPA.[7] ASPA's governance structure initially included a Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and Chief Clinical Officer ("CCO").[8] However, in approximately 2011, ASPA modified its governance structure, changing the executive positions.[9] The CEO became the Chairman of the Board ("Chairman"), the CCO remained, the CFO became the Treasurer, and ASPA created a new position, the Chief People Officer ("CPO").[10] Like under the former structure, all executive members were elected by the Board. [11]

ASPA's corporate structure also includes an Executive Committee.[12] The Executive Committee has the responsibility, on behalf of the Board, "for managing the business and affairs of [ASPA] between meetings of the Board in order to provide an efficient, expeditiously assembled forum to investigate, discuss, analyze, oversee and make decisions regarding day-to-day operations of the Corporation."[13] Additionally, a critical part of the Executive Committee's function is to "make recommendations to the Board with respect to corporate policies and practices and on all matters requiring Board action."[14] At all times relevant to the instant matter, the Executive Committee was comprised of the Chairman, CCO, CPO, Treasurer, two at-large members, who were elected by the Board, and the Executive Director, who, as discussed below, was responsible for overseeing ASPA's administration.[15]

---

[7] Ex. 5, ASPA Bylaws, at 2.
[8] Ex. 5, ASPA Bylaws, at 42.
[9] Ex. 5, ASPA Bylaws, at 7.
[10] Ex. 5, ASPA Bylaws, at 7.
[11] Ex.5, ASPA Bylaws, at 7.
[12] Ex. 5, ASPA Bylaws, at 5.
[13] Ex. 5, ASPA Bylaws, at 5.
[14] Ex. 5, ASPA Bylaws, at 7.
[15] Ex. 5, ASPA Bylaws, at 7.

Dr. Schneider joined ASPA in 1988 and has served as a Board member since 1989.[16] Schneider became CEO (later titled Chairman) in 2010 and was integral to managing ASPA.[17] Dr. Silverstein currently serves as ASPA's CCO and, like Schneider, is a shareholder-Board member.[18] Because he is the CCO, Silverstein also sits on the Executive Committee.

In 2008, Plaintiff, who was then employed with Blue Cross Blue Shield, was contacted by ASPA because ASPA was seeking to hire a new Executive Director.[19] Plaintiff was interviewed by ASPA and ultimately selected to be the Executive Director.[20] As the Executive Director, Plaintiff was responsible for overseeing the corporation's business operation.[21] Under her employment contract, Plaintiff's primary duties included "overseeing billing and collection by [ASPA's] third party billing company, assisting with billing compliance issues, negotiating managed care contracts, monitoring the performance of vendors providing services to [ASPA], overseeing [ASPA's] malpractice and other insurance carriers, and addressing health and benefit plan administration."[22]

**B. Plaintiff's Employment Contract with ASPA**

Because Plaintiff was leaving a position at Blue Cross that she enjoyed and also was considering competing offers, she negotiated certain aspects of her Employment Contract with ASPA.[23] Specifically, Plaintiff testified that she negotiated provisions of her

---

[16] T2 at 38-39. Schneider left ASPA for a few years around 1999 to 2001 but subsequently returned to the practice. T2 at 38-39.
[17] T2 at 41-44.
[18] T2 at 142.
[19] T1 at 23-24.
[20] T1 at 25.
[21] Ex. 4, Employment Agreement, at 1.
[22] Ex. 4, Employment Agreement, at 1.
[23] T1 at 25.

Employment Contract concerning (1) base salary, (2) annual increases to base salary, (3) bonuses, (4) pension contributions, and (5) paid time off ("PTO"), which could be used for vacation or for sick days.[24] Plaintiff executed an Employment Contract with ASPA effective September 29, 2008.[25] Certain provisions of Plaintiff's Employment Contract are central to the instant case, including provisions relating to Plaintiff's entitlement to a bonus, the parties' ability to terminate the Agreement, and Plaintiff's entitlement to severance.

### i. Bonus

Section 4(c) of Plaintiff's Employment Contract states that Plaintiff "shall be eligible for a bonus in an amount equal to six and one-half percent (6 1/2%) of total Compensation . . . paid to Senior Board Member Anesthesiologists employed by [ASPA] on a full time basis."[26] Section 4(c) provides that the "[b]onus shall be prorated for any partial calendar year at the termination of this Agreement upon Compensation paid for such calendar year, unless such termination is for cause by [ASPA]."[27]

On September 28, 2011, Schneider, in his capacity as ASPA's Chief Executive Officer, agreed to give Plaintiff a "[b]onus increase from 6.5% to 8% with the additional 1.5% [being] tied to [Plaintiff's] 2011 Goals."[28] The parties agree that the additional 1.5% was intended to be discretionary.[29] The dispute is over whether the original 6.5% was discretionary or not. According to testimony by Schneider, Plaintiff received her 6.5% bonus in 2009 and 2010, as well as her bonus in 2011, which presumably included both the 6.5%

---

[24] T1 at 25-26.
[25] Ex. 4, Employment Agreement, at 1.
[26] Ex. 4, Employment Agreement, at 3.
[27] Ex. 4, Employment Agreement, at 3.
[28] Ex. 6, 2011 Employment Agreement Amendment.
[29] Ex. 30, Masterson-Carr Deposition, at 16.

6

and the additional 1.5%.[30] All parties questioned testified that no goals, whether in 2011 or otherwise, were ever created pursuant to which Plaintiff's performance was evaluated for either bonus.

### ii. Termination

Terms relating to termination of Plaintiff's Employment Contract are within Section 3 of the contract. Section 3(d) permits either party to terminate the Employment Contract "without stated cause by giving the other party at least ninety (90) days' advance written notice of intent to terminate."[31] Additionally, pursuant to subsection (b) of Section 3, either party is permitted to terminate the Employment Contract "for cause."[32] The Agreement defines "for cause" as including, *inter alia*, "(i) Breach by a party of any material term of th[e] Employment Agreement . . . ; [and] (ii) [Plaintiff's] failure to adhere to any of [ASPA's] policies or written directive or instruction . . ."[33]

### iii. Severance

Pursuant to Section 11(a) of her Employment Contract, Plaintiff "shall also be eligible to receive severance compensation" in the event of termination of the Employment Contract "(i) by [ASPA] without cause . . . ; or (ii) by [Plaintiff] with cause (but only if [Plaintiff] has properly fulfilled all other contractual obligations)."[34]

---

[30] T2 at 123-24. Schneider was not precise in his testimony as to the percentage of the 2011 bonus that Plaintiff received. However, he testified that, to the best of his knowledge, Plaintiff had received her "bonus" in 2011. Since Schneider previously spoke about the 2009 and 2010 bonuses simply as Plaintiff's "bonus" for the respective years, it is reasonable for the Court to infer that Schneider meant "entire bonus" when he testified that Plaintiff received her bonus in 2011.

[31] Ex. 5, ASPA Bylaws, at 3.

[32] Ex. 5, ASPA Bylaws, at 2.

[33] Ex. 5, ASPA Bylaws, at 2.

[34] Ex. 4, Employment Agreement, at 7.

7

Section 11(b) explains that, after the first year of Plaintiff's employment with ASPA, "a sum equal to ninety (90) days salary shall be payable to [Plaintiff] as severance."[35] All parties agree that, pursuant to Section 11, Plaintiff would not be entitled to severance if she (i) was terminated by ASPA with cause or (ii) resigned from ASPA without cause.

## C. Plaintiff's Departure from ASPA

On April 16, 2012, Plaintiff's employment with ASPA ended. The parties dispute whether Plaintiff was terminated with cause by the Executive Committee or whether Plaintiff voluntarily resigned when she was told that the Executive Committee would recommend her termination to the Board. Both parties agree, and it is clear from the record, that the relationship between Plaintiff and ASPA had been eroding for some time before Plaintiff's employment ended. Defendants allege that the erosion was caused by Plaintiff's labor law violations and other misconduct including gossiping about doctors' personal lives.[36] Plaintiff denies any misconduct and attributes the erosion of the relationship to disagreement concerning the direction that the company was taking and alleged personal animus from Dr. Schneider and Dr. Silverman.[37]

## III. STANDARD OF REVIEW

The Court is the finder of fact in a bench trial.[38] The plaintiff must prove each element of her claim by a preponderance of the evidence, meaning that the Court shall find in

---

[35] Ex. 4, Employment Agreement, at 7.

[36] T2 at 90-91, T2 at 126.

[37] Plaintiff suggests that this animus originated from an incident in March 2012. Dr. Schneider allegedly altered the attachments to the meeting minutes of the Executive Committee. Plaintiff allegedly reported the alleged incident to nonexecutive committee members, which allegedly angered Schneider and Silverstein. T2 at 45-50.

[38] *Pencader Associates, LLC v. Synergy Direct Mortg. Inc.*, 2010 WL 2681862, at *2 (Del. Super. June 30, 2010).

8

favor of the party upon whose side "the greater weight of the evidence is found."[39] Because the Court is the finder of fact, it is up to the Court to weigh the credibility of witnesses and resolve conflicts in witness testimony.[40]

## IV. TERMINATION CLAIM

### A. The Parties' Testimony at Trial

As stated above, both parties agree that the relationship between ASPA and Plaintiff had deteriorated before Plaintiff's employment with ASPA ended on April 16, 2012. Plaintiff testified that she had a "confrontation" with Dr. Silverstein in late March 2012.[41] Plaintiff testified that after this confrontation, she texted her husband to tell him that she thought that she had just lost her job.[42] Dr. Silverstein confirmed that he had had a hostile interaction with Plaintiff in late March.[43] Dr. Silverstein testified that he apologized two days after the incident, but he did not feel like the issue was completely resolved.[44] Nonetheless, Silverstein testified that "so far as [he] knew, that was the end of it."[45]

Plaintiff testified that the week before her employment with ASPA ended, on April 11, 2012, she received a phone call from Dr. Nick Gagliano, who was one of the ASPA partners.[46] According to Plaintiff, Dr. Gagliano, who did not testify at trial, asked Plaintiff if she was aware that Dr. Schneider, who was then Chairman of the Board, and Dr. Lucente, who was then HR Officer, had been meeting behind closed doors.[47] Dr. Schneider confirmed

---

[39] *Id.* (quoting *Pouls v. Windmill Estates, LLC,* 2010 WL 2348648, at *4 (Del. Super. June 10, 2010)).
[40] *Id.* at *3.
[41] T1 at 50-51.
[42] T1 at 51.
[43] T3 at 149-152.
[44] T3 at 151.
[45] T3 at 151.
[46] T1 at 52
[47] T1 at 52.

9

in his trial testimony that he had a private conversation with Dr. Lucente on April 10, 2012, concerning alleged misconduct by Plaintiff.[48] Plaintiff testified that she told Dr. Gagliano that she was not aware of these meetings.[49] Plaintiff testified that Dr. Gagliano expressed concern that Plaintiff, as Executive Director, was unaware of these meetings between the Chairman and the HR Officer.[50] Plaintiff testified that she concluded that she had been excluded from these meetings because they concerned her.[51]

Plaintiff testified that, a couple days later, on Friday, April 13, 2012, Plaintiff heard that "a serious HR issue was going to be announced next week."[52] Plaintiff also testified that she received a "very odd text [message]" from Tina Smith, who handled general HR issues, saying that she would not be in that day and would not be available by phone.[53] Plaintiff testified that, under these circumstances, she further concluded that the HR announcement would involve her.[54]

Plaintiff testified that, on Monday, April 16, 2012, she contacted Schneider and Dr. Lucente in two separate phone calls to ask them what was going on.[55] Plaintiff maintains that she confronted both Schneider and Lucente, telling both of them that Plaintiff knew something was going on that involved her.[56] Plaintiff alleges that neither Schneider nor Lucente would provide her with any details, but Lucente finally told Plaintiff that Mary Quinn, an HR consultant who had been working with ASPA, was scheduling a meeting

---

[48] T3 at 56-57.
[49] T1 at 52.
[50] T1 at 52.
[51] T1 at 53.
[52] T1 at 54.
[53] T1 at 54. Tina Smith also did not testify at trial.
[54] T1 at 54.
[55] T1 at 55.
[56] T1 at 55.

concerning the issue.[57]  In his trial testimony, Dr. Lucente confirmed that he did speak by phone with Plaintiff that morning and that he told Plaintiff that he could not discuss the details of the upcoming meeting.[58]  Plaintiff testified that she then asked Mary Quinn, who told her that the meeting was scheduled for around 11:30 a.m. that morning.[59]  Plaintiff testified that she thought that she was being terminated and began to pack up her office.[60]

It is undisputed that sometime after 11:00 a.m., Dr. Schneider, Dr. Lucente, Mary Quinn, and Dr. Chua[61] came into Plaintiff's office.  Plaintiff alleges that Schneider opened the meeting by telling her that the Executive Committee had made a unanimous decision to terminate Plaintiff for cause.[62]  Schneider, Lucente, and Quinn allege that Schneider only told Plaintiff that the Committee was *recommending* termination with cause.[63]

Plaintiff testified that she asked Schneider what the cause was, and he would not go into detail, but told her that the cause was related to a comment Plaintiff made about other physicians in the group in front of staff as well as Plaintiff's speaking about employee health issues in front of the staff.[64]  Plaintiff testified that at the time she did not know what the comment was.[65]  In his trial testimony, Schneider confirmed that he gave Plaintiff "a couple of examples" of the issues that were the basis for the Executive Committee's decision, but Schneider did not confirm what these examples were.[66]

---

[57] T1 at 55.
[58] T3 at 17.
[59] T1 at 55.  The issue of this conversation confirming the meeting time was not explored in Mary Quinn's trial testimony.
[60] T1 at 56.
[61] Dr. Chua was another member of the Executive Committee.
[62] T1 at 56.
[63] T1 at 70-71; T3 at 17-18; T3 at 79.
[64] T1 at 57.
[65] T1 at 57.
[66] T2 at 71.

Schneider alleges that he explicitly told Plaintiff that she was not being terminated.[67] According to Schneider's testimony, they told her, "We're not terminating you. We're recommending this termination. But the issues are significant, and we don't think they're recoverable."[68] Schneider testified that he then told Plaintiff that she could resign instead.[69]

Schneider, Lucente, and Quinn all testified that there was some additional discussion after which Plaintiff said, "I resign."[70] Schneider testified that Plaintiff agreed to follow up with a written letter confirming her resignation.[71] Plaintiff does not dispute that she said the words "I resign." However, Plaintiff alleges that she only said these words in response to the question of what she wanted to tell the staff.[72]

The parties agree that, at some point in the meeting, Schneider recommended that Plaintiff leave the office. Plaintiff said that she wanted to say goodbye to the staff. Plaintiff testified that Schneider asked her what she was going to tell the staff.[73] Plaintiff testified that because she did not know why she was being terminated and because she did not want to place the administrative staff in an uncomfortable position, Plaintiff told Schneider, "I will tell them that I resigned."[74] Plaintiff testified that she then proceeded to go out and say goodbye to the administrative staff. Plaintiff told some of them that she had resigned.[75]

---

[67] T2 at 70-71.
[68] T2 at 70-71.
[69] T2 at 70.
[70] T2 at 71; T3 at 18 ; T3 at 79.
[71] T2 At 71.
[72] T1 at 59.
[73] T1 at 59.
[74] T1 at 59.
[75] T1 at 59. However, according to Plaintiff's testimony, she told all of the physicians that she had been terminated. TI at 60.

It is undisputed that Plaintiff received a follow-up letter from ASPA on April 30, 2012, stating that Plaintiff had resigned and presenting a proposed severance agreement.[76] It is undisputed that Plaintiff never submitted a written termination letter and never signed a separation agreement.[77] On May 3, 2012, Plaintiff sent a letter to the Executive Committee as well as to numerous members of the Board.[78] In the May 3 letter, Plaintiff stated that she had been terminated "for cause" but that she did not understand what the cause was.[79] Plaintiff testified that she sent this letter in response to the correspondence she had received from ASPA saying that she had resigned, and she wanted to make clear that this was untrue.[80]

## B. The Court Finds that Plaintiff Resigned from ASPA

Plaintiff's first claim is for breach of contract.[81] An actionable breach of contract claim requires the plaintiff to prove: (1) the existence of the contract, (2) a breach of that contract, and (3) damages resulting from breach.[82]

Plaintiff maintains that ASPA breached her Employment Contract by "failing to follow [the company's] policies and procedures by terminating Plaintiff in a sudden manner without the benefit of an opportunity to cure any alleged deficiencies."[83] Plaintiff argues that the failure to allow Plaintiff an opportunity to cure the alleged deficiencies was in violation of her Employment Contract and usual company practice.[84] However, in order to prove that

---

[76] The April 30, 2012 letter stated, "[a]s you stated on Monday, April 16, 2012, and as we discussed, you have voluntarily resigned your employment with Anesthesia Services, P.A., ("ASPA") effective April 16, 2012." Ex. 29, Letter to Masterson-Carr. Plaintiff acknowledged receipt of this letter in her testimony at trial. T1 at 60-61.
[77] T1 at 60.
[78] Ex. 7, Masterson-Carr Letter.
[79] Ex. 7, Masterson-Carr Letter, at 1.
[80] T1 at 63.
[81] Ex. 1, Complaint, at 7.
[82] *Pencader Associates*, 2010 WL 2681862, at *2.
[83] Ex. 1, Complaint, at 7.
[84] T1 at 65-66.

13

ASPA breached by failing to follow proper procedure in terminating Plaintiff, Plaintiff must first establish that she was in fact terminated.

Considering the evidence that has been presented, the Court finds it more likely than not that Plaintiff voluntarily resigned when she was confronted with the recommendation of the Executive Committee. In keeping with the legal standard that Plaintiff must prove that she was terminated by a preponderance of the evidence, the Court finds that Plaintiff has failed to satisfy this burden. In arriving at this conclusion, the Court finds the following facts particularly compelling.

### i. Plaintiff's Deposition Testimony

The Court finds that Plaintiff admitted in her deposition testimony that she resigned. Although Plaintiff tried to explain away this testimony at trial (by saying that the "I resigned" statements were only in regards to what she planned to tell her coworkers), this explanation is not supported by Plaintiff's statements in her original deposition testimony.

In her deposition, Plaintiff testified as follows in response to questioning by Defense Counsel:

**Q:** Did you say, I resign?

**A:** No.

**Q:** If there were four other people in the room and one has testified and three others will testify that you said, I resign, they're not telling the truth?

**A:** They gave me a choice, you have a choice to resign or be terminated and because I didn't know what the termination was, what the cause was, I said, I'll resign.

**Q:** So, you said, I'll resign, is that correct?

**A:** Yes.

**Q:** And then did you say, "I will tell the staff I'm leaving"?

**A:** No. They said, What are you going to tell the staff? I said, I'm going to tell them I resigned. I couldn't tell them I was terminated because they would say for what and I didn't know.

**Q:** But you, in fact, said, I'll resign.

**[Plaintiff's Counsel]:** Objection to form, mischaracterizes her statement.

**A:** I was given a choice and I chose that choice. It was a voluntary resignation. It was something I had a choice to do.

**Q:** You thought while you were sitting there that your choice was you were being terminated for cause or you could resign, is that correct?

**A:** Yes.

**Q:** What you then in response chose was to resign?

**[Plaintiff's Counsel]:** Objection to form. You can answer.

**Q:** Is that correct?

**A:** I did.[85]

When Plaintiff was questioned about her deposition testimony at trial, specifically the passages excerpted above, Plaintiff maintained that her deposition testimony that she had said "I resign" concerned only what she planned to tell her coworkers.[86] The Court finds that this is an implausible interpretation of Plaintiff's deposition statements. Plaintiff makes it clear that she saw herself as having "a choice" to resign and that she "chose that choice [i.e., to

---

[85] Ex. 30, Masterson-Carr Deposition, at 97-98.
[86] T1 at 140.

resign]."[87] When asked the clarificatory question, "What you then in response chose was to resign?", Plaintiff answered, "I did."[88]

While it is true that this passage also addresses the issue of what Plaintiff would tell her coworkers, the portions concerning Plaintiff's resignation and the portions concerning what she would tell her coworkers are logically separated. It is not plausible, contrary to what Plaintiff suggests in her testimony at trial, that everything Plaintiff said in this portion of her deposition testimony was simply a recitation of what she planned to tell her coworkers. Plaintiff's description of her "choice" to resign comes in direct response to the question of how Plaintiff would explain the testimony of the four other people present at the meeting who would testify that she resigned, not in response to a question about what she would tell her coworkers.[89]

### ii. Plaintiff's Subsequent Correspondence with ASPA

Plaintiff's subsequent correspondence with members and representatives of ASPA after the April 16, 2012 meeting also suggests that she was not terminated. Plaintiff testified that, the day after the April 16 meeting, she received an email from Dr. Schneider, stating that "As discussed with you on Monday with Drs. Chua and Lucente present, ASPA's executive committee has agreed unanimously to recommend to the board of directors the termination of your employment for cause."[90] The email stated that Plaintiff had been given the option to resign during the meeting and that "[Plaintiff] verbally stated during the meeting that [Plaintiff is] resigning [Plaintiff's] employment with ASPA."[91] Plaintiff testified that this email was at odds with her understanding of what had happened at the April 16 meeting (i.e.,

---

[87] Ex. 30, Masterson-Carr Deposition, at 97-98.
[88] Ex. 30, Masterson-Carr Deposition at 98.
[89] Ex. 30, Masterson-Carr Deposition, at 97.
[90] Ex. 34, Schneider Email; T1 at 132-133.
[91] Ex. 34, Schneider Email.

that Plaintiff thought she had been terminated, not that the Executive Committee was merely recommending termination), yet Plaintiff made no attempt to contact Dr. Schneider to clarify or challenge this alleged discrepancy.[92]  It is implausible that a sophisticated party such as Plaintiff, who had worked in Human Resources and who had been involved in the termination process for other employees, would not request clarification.[93]

Further, when Dr. Schneider subsequently sent Plaintiff an April 23, 2012 letter confirming her oral resignation and asking for a written resignation letter,[94] Plaintiff did not reply at all.[95]  If Plaintiff believed that she had not resigned but had been terminated, it would have been reasonable for her to respond to this letter disputing its characterization of her separation from ASPA.  Instead, Plaintiff did not communicate with ASPA or any of its members concerning her alleged termination until May 3, 2012, when she sent a letter to various ASPA Board members stating that she had been terminated.[96]  Of particular note is the fact that the letter was dated the day after Plaintiff had retained counsel in this matter.[97] The reasonable inference is that Plaintiff wrote the letter asserting that she had been terminated in anticipation of the present litigation rather than as a good faith attempt to set the record straight regarding the events of April 16.

### iii. Plaintiff's Previous Indications of her Willingness to Resign

The Court also finds notable Plaintiff's testimony concerning her general willingness to leave ASPA in the event of certain sorts of disagreement.  First, Plaintiff testified that she said she "would resign" if the Board chose to bring the issue of hiring her brother's

---

[92] T1 at 134.
[93] T1 at 65.
[94] Ex. 14, Schneider Letter.
[95] T1 at 138-139.
[96] Ex. 7, Masterson-Carr Letter.
[97] T1 at 148.

company[98] before the full Board because she believed that "a decision at this level should not have to go to the full board."[99] Similarly, Plaintiff testified that she would "walk away graciously" from ASPA "if there was ever a time that anyone did not think [Plaintiff] was right for the job."[100]

It is clear from Plaintiff's testimony that she took great pride in her career and her job with ASPA.[101] Plaintiff took her position as Executive Director very seriously and considered it her personal duty to act in the best interest of the organization.[102] Not only was Plaintiff in fact very devoted to her job, but it was also important to Plaintiff that others saw her as such. Plaintiff was very concerned about her professional image.[103] Given these facts, the Court makes the reasonable inference that, when confronted with the judgment of the Executive Committee that she was no longer fit for her position, Plaintiff acted to preserve her future employment options as well as her self-image by resigning her position.

## V. BONUS CLAIM

### A. The Parties' Testimony at Trial

Plaintiff alleges that ASPA violated the Delaware Wage Payment and Collection Act in failing to pay her the 6.5% bonus for the time she worked at ASPA in 2012.[104] Plaintiff

---

[98] ASPA hired Plaintiff's brother's company to do marketing work. Ex. 30 at 44. According to Plaintiff, Dr. Schneider and another ASPA partner, Dr. Tolpin, both expressed concern over the choice to hire Plaintiff's brother.

[99] Ex. 30, Masterson-Carr Deposition, at 146.

[100] Ex. 30, Masterson-Carr Deposition, at 147. Although Plaintiff refused to say that "walk away graciously" meant "resign," the Court finds that this is the most plausible interpretation of Plaintiff's comment.

[101] T1 at 77-79.

[102] T1 at 107, 115.

[103] T1 at 77-79.

[104] The Delaware Wage Payment and Collection Act, 19 *Del. C.* §1101 *et seq.*, provides for a civil action to recover unpaid wages. When an employee is separated from her employment (whether she quits, resigns, is discharged, suspended, or laid off), the wages earned become due and payable on the next regularly scheduled payday. 19 *Del. C.* §1103. A yearly bonus is considered "wages" under the Act. *SCOA Indus., Inc. v. Bracken*, 374 A.2d 263 (Del. 1977).

18

testified that the 6.5% bonus in her Employment Contract is non-discretionary.[105] Plaintiff testified that were never any goals that Plaintiff needed to meet in order to be entitled to the 6.5% bonus.[106] Plaintiff concedes that the additional 1.5% bonus that Plaintiff negotiated in 2011 was discretionary.[107]

Defendants maintain that both the 6.5% and 1.5% bonuses were discretionary. At trial, Schneider testified that both bonuses were intended to be tied to specific yearly goals.[108] However, Schneider also testified that there were never any such goals articulated for any bonus, and that Plaintiff's compensation included the 6.5% bonus in 2009, 2010, and 2011.[109] Schneider maintains that Plaintiff arranged for the bonus to be paid; as Plaintiff was required to provide, and then meet, yearly goals before she would be entitled to her bonus.[110] Dr. Stern, who was CFO at the relevant times, testified that he approved the disbursements of the bonus money to Plaintiff; although he, too, testified that he considered the 6.5% to be a discretionary bonus.[111] Stern said that he gave Plaintiff the bonus because he "couldn't think of a reason why not at that time," but he "also probably said" in a conversation to the CEO at some point "we really ought to have some criteria for [the bonus]."[112]

## B. The Court Finds that Plaintiff is Entitled
## to the 6.5% Bonus

---

[105] T1 at 31.
[106] T1 at 35.
[107] T3 at 171.
[108] T2 at 122.
[109] T2 at 123.
[110] T2 at 123.
[111] T1 at 210
[112] T1 at 210.

19

A contract is ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[113] Ambiguous contracts are generally construed against the drafter.[114] Further, when construing an ambiguous contract, "the court will consider all relevant objective evidence, including: overt statements and acts of the parties, the business context, prior dealings between the parties, and business customs and usage in the industry."[115] "Courts use such evidence to construe the ambiguous contract language in a way that best carries out the reasonable expectations of the parties who contracted in those circumstances."[116]

The Court finds that the terms in Plaintiff's Employment Contract and the 2011 Employment Agreement Amendment are ambiguous. The Employment Contract states, "Employee shall be eligible for a bonus in an amount equal to six and one-half percent."[117] There are two reasonable interpretations of this language: (1) that Employee eligibility is contingent only on the availability of sufficient funds, or (2) that Employee eligibility is contingent on her performance as determined by Employer. The language in the 2011 Amendment is similarly ambiguous. The 2011 Agreement states that Plaintiff would receive a "[b]onus increase from 6.5% to 8% with the additional 1.5% tied to [Employee's] 2011 Goals."[118] This provision could reasonably be interpreted to mean either: (1) that the entire bonus would be tied to some goals, but the 1.5% would be specifically tied to the 2011 goals,[119] or (2) that only the 1.5% would be tied to goals.

---

[113] *Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. Super. 1992).
[114] *Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 630 (Del. 2003).
[115] *Zimmerman v. Crothall*, 62 A.3d 676, 690-91 (Del. Ch. 2013).
[116] *Id*. at 691.
[117] Ex. 4, Employment Agreement, at 3.
[118] Ex. 6, 2011 Employment Agreement Amendment.
[119] In other words, perhaps the 6.5% was tied to set of goals that had been previously articulated or that would be articulated in the future.

20

ASPA is the drafter of both agreements. For this reason, the presumption is that the ambiguous contractual provisions will be construed against ASPA. Further, looking to the past practices of the parties, the Court finds that Plaintiff reasonably expected her 6.5% bonus for the year 2012 to be nondiscretionary. Since the beginning of Plaintiff's employment, ASPA's practice had been to allow Plaintiff the 6.5% bonus irrespective of any performance goals. Dr. Stern, who had been CFO at the time, testified that he approved payment of the 6.5% bonus to Plaintiff in 2009, 2010, and 2011.[120] At the time, there were no performance goals that Plaintiff had to meet in order to receive that bonus, although Stern testified that he "probably said" at some point that there probably should be some criteria for the bonus.[121] In his trial testimony, Dr. Schneider, who had been CEO beginning in 2010, confirmed that Plaintiff had received her 6.5% bonus in 2009, 2010, and 2011 even though no goals had ever been established.[122] While Defendants now dispute whether Plaintiff was entitled to 6.5% bonus in 2009-2011, the Court finds that ASPA knowingly permitted Plaintiff to take the bonus in these years without having to meet any particular goals. The Court finds that ASPA's practice was to treat the 6.5% bonus as nondiscretionary.

The Court has found that Plaintiff resigned and was not terminated. Because Plaintiff's contract clearly states that 6.5% bonus shall be prorated upon termination of employment unless termination was by the employer for cause, Plaintiff is now entitled to the *pro rata* amount of the 6.5% bonus for portion of the year 2012 during which she was employed at ASPA.

## VI. CONCLUSION

---

[120] T1 at 209-210.
[121] T1 at 210.
[122] T2 at 122-124.

21

For the foregoing reasons, the Court finds that Plaintiff was not terminated. Since Plaintiff's claim for Breach of Contract is predicated on the claim that Plaintiff was terminated, this claim is now **MOOT**. Plaintiff is entitled to the *pro rata* amount of her 6.5% bonus for the portion of 2012 that she was employed at ASPA.

The Plaintiff shall notify the Court within 20 days if she wishes to pursue the issue of constructive termination. If Plaintiff so elects, the parties shall have 60 days from the date of the notification to submit simultaneous briefs on the issue.

**IT IS SO ORDERED**.

_____/S/_____

M. JANE BRADY
Superior Court Judge
